## SECURITIES AND EXCHANGE COMMISSION *v.* ZANDFORD

No. 01–147.   Argued March 18, 2002—Decided June 3, 2002

*Matthew D. Roberts* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Clement, Deputy Solicitor General Kneedler, David M. Becker, Jacob H. Stillman, Richard M. Humes, Katharine B. Gresham,* and *Susan S. McDonald.*

*Steven H. Goldblatt* argued the cause for respondent. With him on the brief was *Roy T. Englert, Jr.**

---

*Briefs of *amici curiae* urging reversal were filed for AARP et al. by *Deborah M. Zuckerman, Stacy J. Canan, Michael R. Schuster,* and *Kevin Roddy;* and for NASD Regulation, Inc., by *F. Joseph Warin, Douglas R. Cox, Andrew S. Tulumello,* and *Elisse B. Walter.*

JUSTICE STEVENS delivered the opinion of the Court.

The Securities and Exchange Commission (SEC) filed a civil complaint alleging that a stockbroker ·violated both § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U. S. C. § 78j(b), and the SEC's Rule 10b–5, by selling his customer's securities and using the proceeds for his own benefit without the customer's knowledge or consent. The question presented is whether the alleged fraudulent conduct was "in connection with the purchase or sale of any security" within the meaning of the statute and the Rule.

I

Between 1987 and 1991, respondent was employed as a securities broker in the Maryland branch of a New York brokerage firm. In 1987, he persuaded William Wood, an elderly man in poor health, to open a joint investment account for himself and his mentally retarded daughter. According to the SEC's complaint, the "stated investment objectives for the account were 'safety of principal and income.'" App. to Pet. for Cert. 27a. The Woods granted respondent discretion to manage their account and a general power of attorney to engage in securities transactions for their benefit without prior approval. Relying on respondent's promise to "conservatively invest" their money, the Woods entrusted him with $419,255. Before Mr. Wood's death in 1991, all of that money was gone.

In 1991, the National Association of Securities Dealers (NASD) conducted a routine examination of respondent's firm and discovered that on over 25 separate occasions, money had been transferred from the Woods' account to accounts controlled by respondent. In due course, respondent was indicted in the United States District Court for the District of Maryland on 13 counts of wire fraud in violation of 18 U. S. C. § 1343. App. to Pet. for Cert. 40a. The first count alleged that respondent sold securities in the Woods' account and then made personal use of the proceeds. *Id.*, at

42a. Each of the other counts alleged that he made wire transfers between Maryland and New York that enabled him to withdraw specified sums from the Woods' accounts. *Id.*, at 42a–50a. Some of those transfers involved respondent writing checks to himself from a mutual fund account held by the Woods, which required liquidating securities in order to redeem the checks. Respondent was convicted on all counts, sentenced to prison for 52 months, and ordered to pay $10,800 in restitution.

After respondent was indicted, the SEC filed a civil complaint in the same District Court alleging that respondent violated § 10(b) and Rule 10b–5 by engaging in a scheme to defraud the Woods and by misappropriating approximately $343,000 of the Woods' securities without their knowledge or consent. *Id.*, at 27a. The SEC moved for partial summary judgment after respondent's criminal conviction, arguing that the judgment in the criminal case estopped respondent from contesting facts that established a violation of § 10(b).[1] Respondent filed a motion seeking discovery on the question whether his fraud had the requisite "connection with" the purchase or sale of a security. The District Court refused to allow discovery and entered summary judgment against respondent. It enjoined him from engaging in future violations of the securities laws and ordered him to disgorge $343,000 in ill-gotten gains.

The Court of Appeals for the Fourth Circuit reversed the summary judgment and remanded with directions for the District Court to dismiss the complaint. 238 F. 3d 559

---

[1] The scope of Rule 10b–5 is coextensive with the coverage of § 10(b), see *United States* v. *O'Hagan,* 521 U. S. 642, 651 (1997); *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 214 (1976); therefore, we use § 10(b) to refer to both the statutory provision and the Rule.

The complaint also contained allegations that respondent had engaged in excessive trading, or "churning," to generate commission income. App. to Pet. for Cert. 30a. That claim was originally excluded from the summary judgment motion, and later abandoned by the SEC.

(2001). It first held that the wire fraud conviction, which only required two findings—(1) that respondent engaged in a scheme to defraud and (2) that he used interstate wire communications in executing the scheme—did not establish all the elements of a § 10(b) violation. Specifically, the conviction did not necessarily establish that his fraud was "in connection with" the sale of a security. *Id.*, at 562.[2] The court then held that the civil complaint did not sufficiently allege the necessary connection because the sales of the Woods' securities were merely incidental to a fraud that "lay in absconding with the proceeds" of sales that were conducted in "a routine and customary fashion," *id.*, at 564. Respondent's "scheme was simply to steal the Woods' assets" rather than to engage "in manipulation of a particular secu-

---

[2] A summary of the evidence in the Court of Appeals' opinion affirming the judgment in respondent's criminal case supports the conclusion that the verdict did not necessarily determine that the fraud was connected with the sale of a security:

"The Government presented ample direct and circumstantial evidence showing that Zandford had engaged in a scheme to defraud the Woods. It showed that: (1) Zandford had systematically transferred large sums of money from the Woods' account to his own accounts over a nineteen month period; (2) prior to November 1987, the Woods had no relationship with Zandford; (3) Zandford, and not the Woods, benefited from the money transfers; (4) the Woods were vulnerable victims due to their physical and mental limitations; (5) the personal services agreement, the loan, and the vintage car restoration business were not only contrary to the Woods' stated investment objectives, but they violated the rules of NASD and those of Zandford's employer that prohibited brokers from engaging in such arrangements; and (6) vehicles owned as part of the vintage car restoration business were titled in the name of Zandford's girlfriend as opposed to the Woods' names. Additional evidence showing a scheme to defraud included Zandford's failure to disclose to his employer the existence of the agreements and personal loans; his failure to report on his taxes or bank loan applications that he received income from acting as the personal representative; and his failure to disclose on his taxes his involvement in a vintage car restoration business. Zandford's contention that there is insufficient evidence supporting that he had engaged in a scheme to defraud the Woods is meritless." *Id.*, at 36a–37a.

rity." *Id.*, at 565. Ultimately, the court refused "to stretch the language of the securities fraud provisions to encompass every conversion or theft that happens to involve securities." *Id.*, at 566. Adopting what amounts to a "fraud on the market" theory of the statute's coverage, the court held that without some "relationship to market integrity or investor understanding," there is no violation of § 10(b). *Id.*, at 563.

We granted the SEC's petition for a writ of certiorari, 534 U. S. 1015 (2001), to review the Court of Appeals' construction of the phrase "in connection with the purchase or sale of any security." Because the Court of Appeals ordered the complaint dismissed rather than remanding for reconsideration, we assume the allegations contained therein are true and affirm that disposition only if no set of facts would entitle petitioner to relief. See *Hartford Fire Ins. Co.* v. *California*, 509 U. S. 764, 811 (1993). We do not reach the question whether the record supports the District Court's grant of summary judgment in the SEC's favor—a question that requires all potential factual disputes to be resolved in respondent's favor.[3] We merely hold that the allegations of the complaint, if true, entitle the SEC to relief; therefore, the Court of Appeals should not have directed that the complaint be dismissed.

---

[3] Nor do we review the District Court's decision denying respondent discovery—a decision that may have been influenced by respondent's frequent filings while incarcerated. The District Court noted that respondent "has been an active litigant before and during his incarceration." *Id.*, at 16a, n. 1 (citing *Zandford* v. *NASD*, 30 F. Supp. 2d 1 (DC 1998); *Zandford* v. *NASD*, 19 F. Supp. 2d 1 (DC 1998); *Zandford* v. *NASD*, 19 F. Supp. 2d 4 (DC 1998); *Zandford* v. *Prudential-Bache Securities, Inc.*, 112 F. 3d 723 (CA4 1997); *Zandford* v. *Prudential-Bache Securities, Inc.*, 111 F. 3d 963 (DC 1998) (judgt. order); *Zandford* v. *Prudential-Bache Securities, Inc.*, Civ. Action No. 94–0036, 1995 WL 507169 (D. D. C., Aug. 15, 1995); *Zandford* v. *Prudential-Bache Securities, Inc.*, Civ. Action No. HAR–90–2568, 1994 WL 150918 (D. Md., Feb. 22, 1994); *Zandford* v. *NASD*, Civ. Action No. 93–1274, 1993 WL 580761 (D. D. C., Nov. 5, 1993)).

## II

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U. S. C. § 78j. Rule 10b–5, which implements this provision, forbids the use, "in connection with the purchase or sale of any security," of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 CFR § 240.10b–5 (2000). Among Congress' objectives in passing the Act was "to insure honest securities markets and thereby promote investor confidence" after the market crash of 1929. *United States* v. *O'Hagan*, 521 U. S. 642, 658 (1997); see also *United States* v. *Naftalin*, 441 U. S. 768, 775 (1979). More generally, Congress sought "'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Affiliated Ute Citizens of Utah* v. *United States*, 406 U. S. 128, 151 (1972) (quoting *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963)).

Consequently, we have explained that the statute should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" 406 U. S., at 151 (quoting *Capital Gains Research Bureau, Inc.*, 375 U. S., at 195). In its role enforcing the Act, the SEC has consistently adopted a broad reading of the phrase "in connection with the purchase or sale of any security." It has maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b–5. See, *e. g.*, *In re Bauer*, 26 S. E. C. 770 (1947); *In re Southeastern Securities Corp.*, 29 S. E. C. 609 (1949). This interpretation of the ambiguous text of § 10(b), in the context of formal adjudication, is entitled to deference

if it is reasonable, see *United States* v. *Mead Corp.*, 533 U. S. 218, 229–230, and n. 12 (2001). For the reasons set forth below, we think it is. While the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b), *Marine Bank* v. *Weaver*, 455 U. S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud"), neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act.

The SEC claims respondent engaged in a fraudulent scheme in which he made sales of his customer's securities for his own benefit. Respondent submits that the sales themselves were perfectly lawful and that the subsequent misappropriation of the proceeds, though fraudulent, is not properly viewed as having the requisite connection with the sales; in his view, the alleged scheme is not materially different from a simple theft of cash or securities in an investment account. We disagree.

According to the complaint, respondent "engaged in a scheme to defraud" the Woods beginning in 1988, shortly after they opened their account, and that scheme continued throughout the 2-year period during which respondent made a series of transactions that enabled him to convert the proceeds of the sales of the Woods' securities to his own use. App. to Pet. for Cert. 27a–29a. The securities sales and respondent's fraudulent practices were not independent events. This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so. Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market. Rather, respondent's fraud coincided with the sales themselves.

Taking the allegations in the complaint as true, each sale was made to further respondent's fraudulent scheme; each

was deceptive because it was neither authorized by, nor disclosed to, the Woods. With regard to the sales of shares in the Woods' mutual fund, respondent initiated these transactions by writing a check to himself from that account, knowing that redeeming the check would require the sale of securities. Indeed, each time respondent "exercised his power of disposition for his own benefit," that conduct, "without more," was a fraud. *United States* v. *Dunn*, 268 U. S. 121, 131 (1925). In the aggregate, the sales are properly viewed as a "course of business" that operated as a fraud or deceit on a stockbroker's customer.

Insofar as the connection between respondent's deceptive practices and his sale of the Woods' securities is concerned, the case is remarkably similar to *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 404 U. S. 6 (1971). In that case the directors of Manhattan Casualty Company authorized the sale of the company's portfolio of treasury bonds because they had been "duped" into believing that the company would receive the proceeds of the sale. *Id.*, at 9. We held that "Manhattan was injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities." *Id.*, at 10. In reaching this conclusion, we did not ask, as the Fourth Circuit did in this case, whether the directors were misled about the value of a security or whether the fraud involved "manipulation of a particular security." 238 F. 3d, at 565. In fact, we rejected the Second Circuit's position in *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 430 F. 2d 355, 361 (1970), that because the fraud against Manhattan did not take place within the context of a securities exchange it was not prohibited by § 10(b). 404 U. S., at 10. We refused to read the statute so narrowly, noting that it "must be read flexibly, not technically and restrictively." *Id.*, at 12. Although we recognized that the interest in " 'preserving the integrity of the securities markets' " was one of the purposes animating the statute, we rejected the notion that § 10(b) is

limited to serving that objective alone. *Ibid.* ("We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate misman-agement. But we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized mar-kets or face to face").

Like the company directors in *Bankers Life,* the Woods were injured as investors through respondent's deceptions, which deprived them of any compensation for the sale of their valuable securities. They were duped into believing respondent would "conservatively invest" their assets in the stock market and that any transactions made on their behalf would be for their benefit for the " 'safety of principal and income.' " App. to Pet. for Cert. 27a. The fact that re-spondent misappropriated the proceeds of the sales provides persuasive evidence that he had violated § 10(b) when he made the sales, but misappropriation is not an essential element of the offense. Indeed, in *Bankers Life,* we flatly stated that it was "irrelevant" that "the proceeds of the sale that were due the seller were misappropriated." 404 U. S., at 10. It is enough that the scheme to defraud and the sale of securities coincide.

The Court of Appeals below distinguished *Bankers Life* on the ground that it involved an affirmative misrepresentation, whereas respondent simply failed to inform the Woods of his intent to misappropriate their securities. 238 F. 3d, at 566. We are not persuaded by this distinction. Respondent was only able to carry out his fraudulent scheme without making an affirmative misrepresentation because the Woods had trusted him to make transactions in their best interest with-out prior approval. Under these circumstances, respond-ent's fraud represents an even greater threat to investor confidence in the securities industry than the misrepresenta-tion in *Bankers Life.* Not only does such a fraud prevent investors from trusting that their brokers are executing

transactions for their benefit, but it undermines the value of a discretionary account like that held by the Woods. The benefit of a discretionary account is that it enables individuals, like the Woods, who lack the time, capacity, or know-how to supervise investment decisions, to delegate authority to a broker who will make decisions in their best interests without prior approval. If such individuals cannot rely on a broker to exercise that discretion for their benefit, then the account loses its added value. Moreover, any distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to her clients. See *Chiarella* v. *United States*, 445 U. S. 222, 230 (1980) (noting that "silence in connection with the purchase or sale of securities may operate as a fraud actionable under §10(b)" when there is "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction"); *Affiliated Ute Citizens of Utah* v. *United States*, 406 U. S., at 153.

More recently, in *Wharf (Holdings) Ltd.* v. *United Int'l Holdings, Inc.*, 532 U. S. 588 (2001), our decision that the seller of a security had violated §10(b) focused on the secret intent of the seller when the sale occurred. The purchaser claimed "that Wharf sold it a security (the option) while secretly intending from the very beginning not to honor the option." *Id.*, at 597. Although Wharf did not specifically argue that the breach of contract underlying the complaint lacked the requisite connection with a sale of securities, it did assert that the case was merely a dispute over ownership of the option, and that interpreting §10(b) to include such a claim would convert every breach of contract that happened to involve a security into a violation of the federal securities laws. *Id.*, at 596. We rejected that argument because the purchaser's claim was not that the defendant failed to carry out a promise to sell securities; rather, the claim was that the defendant sold a security while never intending to honor its agreement in the first place. *Id.*, at 596–597. Similarly,

in this case the SEC claims respondent sold the Woods' securities while secretly intending from the very beginning to keep the proceeds. In *Wharf*, the fraudulent intent deprived the purchaser of the benefit of the sale whereas here the fraudulent intent deprived the seller of that benefit, but the connection between the deception and the sale in each case is identical.

In *United States* v. *O'Hagan*, 521 U. S. 642 (1997), we held that the defendant had committed fraud "in connection with" a securities transaction when he used misappropriated confidential information for trading purposes. We reasoned that "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus coincide. This is so even though the person or entity defrauded is not the other party to the trade, but is, instead, the source of the nonpublic information." *Id.*, at 656. The Court of Appeals distinguished *O'Hagan* by reading it to require that the misappropriated information or assets not have independent value to the client outside the securities market, 238 F. 3d, at 565. We do not read *O'Hagan* as so limited. In the chief passage cited by the Court of Appeals for this proposition, we discussed the Government's position that "[t]he misappropriation theory would not . . . apply to a case in which a person defrauded a bank into giving him a loan or embezzled cash from another, and then used the proceeds of the misdeed to purchase securities," because in that situation "the proceeds would have value to the malefactor apart from their use in a securities transaction, and the fraud would be complete as soon as the money was obtained." 521 U. S., at 656 (internal quotation marks omitted). Even if this passage could be read to introduce a new requirement into § 10(b), it would not affect our analysis of this case, because the Woods' securities did not have value for respondent apart from their use in a secu-

rities transaction and the fraud was not complete before the sale of securities occurred.

As in *Bankers Life, Wharf,* and *O'Hagan,* the SEC complaint describes a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide. Those breaches were therefore "in connection with" securities sales within the meaning of § 10(b).[4] Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[4] Contrary to the Court of Appeals' prediction, 238 F. 3d 559, 566 (CA4 2001), our analysis does not transform every breach of fiduciary duty into a federal securities violation. If, for example, a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the fraud would not include the requisite connection to a purchase or sale of securities. Tr. of Oral Arg. 16. Likewise, if the broker told his client he was stealing the client's assets, that breach of fiduciary duty might be in connection with a sale of securities, but it would not involve a deceptive device or fraud. Cf. *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 474–476 (1977).