**UNITED STATES of America,**

v.

**Jodi L. KNUEPPEL, Mark R. Sonday and Gregory L. Tyrer, Defendants.**

**No. 03 CV 0536(NG)(MDG).**

United States District Court, E.D. New York.

Nov. 17, 2003.

Joseph F. Fischer, Watertown, WI, Lester A. Pines, Cullen, Weston, Pines & Bach, Madison, WI, Patrick Cavanaugh Brennan, Brennan, Ramirez & Sesini, LLP, Milwaukee, WI, for Defendants.

Michael T. Cornacchia, United States Attorney's Office, Brooklyn, NY, for Plaintiff.

### *OPINION AND ORDER*

GERSHON, District Judge.

Defendants Jodi L. Knueppel, Mark R. Sonday, Gregory L. Tyrer and Gregory J. Misfeldt have pled guilty to engaging in a criminal conspiracy to violate Securities Exchange Act of 1934 (the "Act") Section 10(b), 15 U.S.C. §§ 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b–5. Misfeldt and Tyrer each pled guilty pursuant to cooperation agreements, under which they divulged the identity and

roles of Knueppel and Sonday. Following the entry of their pleas of guilty, defendants Knueppel, Sonday and Tyrer all moved to avoid the imposition of a prison sentence pursuant to the "no knowledge" provision of 15 U.S.C. 78ff(a). The government opposed the application and took the position that, given defendants' allocutions, in which they pled guilty to conspiracy to violate the Act, and not just to the violation of an SEC Rule, the "no knowledge" provision is inapplicable, and the defendants therefore were not entitled to an evidentiary hearing. On September 10, 2003, I heard oral argument and also held an evidentiary hearing. I now conclude that the government is correct in that the "no knowledge" provision is inapplicable, but that, even if it were, defendants did not meet their evidentiary burden of proving no knowledge.

### Background

The basic facts underlying the prosecution are not in dispute.

Defendants Misfeldt and Tyrer were machinists employed by the same company in Waterloo, Wisconsin. Misfeldt and Tyrer became friendly while working together and at some point during the economic boom of the late nineteen-nineties decided to begin investing in securities. Defendants Knueppel and Sonday were, at all relevant times, employed in various capacities at a company known as Perry–Judd's Incorporated ("Perry"), which prints the financial news magazine, *Business Week*. When they were hired, Knueppel and Sonday each were given employee handbooks which expressly prohibited them from disseminating any information contained in the magazines printed by Perry prior to it becoming public. The handbook also included a warning that a violation of this policy could lead to dismissal and possible civil and criminal sanctions. Additionally, at Perry there were signs posted that warned employees against engaging in such conduct. Nevertheless, when approached by defendant Misfeldt, with whom Knueppel was friendly, she agreed to provide him with certain information contained in *Business Week* prior to it becoming public. To do so, Knueppel would pilfer a copy of *Business Week* magazine prior to its public dissemination and then read the information contained in the "Inside Wall Street" column to either Misfeldt or Tyrer over the telephone. When Knueppel went on maternity leave, she recruited Sonday to continue to provide the information. In exchange for this information Misfeldt and Tyrer would mail Knueppel and Sonday approximately $50 in cash, weekly. At some point, this amount increased to approximately $200.

Armed with this confidential information, Misfeldt and Tyrer would, prior to the close of the markets, acquire stock positions (including short sales), in the public companies that had been reviewed by "Inside Wall Street." The following morning, when the markets reopened, the value of the stocks purchased would generally react in accordance with the opinions offered in "Inside Wall Street," and Misfeldt and Tyrer would then dispose of their stock positions. By following this scheme, Misfeldt and Tyrer made some $1.4 million dollars of profit from approximately May 1997 to February 1999 when they stopped using the scheme. For their roles, Knueppel and Sonday each received approximately $8,800. The government charged all four defendants under the misappropriation theory.

### Application of "No Knowledge" clause of 15 U.S.C. § 78ff(a)

Knueppel, Sonday and Tyrer pled guilty to an information which charges that:

[T]he defendants did knowingly and willfully conspire . . . to use and employ manipulative devices and contrivances in

violation of Rule 10b–5 of the Rules and Regulations of the United States Securities and Exchange Commission ... in that the defendants did knowingly and wilfully conspire ... to defraud ... members of the investing public ... in violation of Title 15, United States Code, Sections 78j and 78ff.

18 U.S.C. § 371, states in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

15 U.S.C. 78j(b), the statute defendants pled guilty to conspiring to violate, provides, in relevant part, that:

It shall be unlawful for any person, ..., to use or employ in connection with the purchase or sale of any security registered on a national securities exchange..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...

Finally, SEC Rule 10b–5 make it unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The penalties for violating 15 U.S.C § 78j(b) and Rule 10b–5 are codified at 15 U.S.C. § 78ff(a), which provides, in relevant part, that:

Any person who wilfully violates any provision of this chapter (other than section 78dd–1 of this title), or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, ... shall upon conviction be fined not more than $1,000,000, or imprisoned or both, ... *but no person shall be subject to imprisonment under this section for the violation of any such rule or regulation if he proves that he had no knowledge of such rule or regulation.* (emphasis added)

 The information to which defendants pled guilty does not, as they suggest, charge just a violation of an SEC Rule but also expressly charges a violation of 18 U.S.C. § 371 and Section 10(b) of the Act, 15 U.S.C § 78j(b). Criminal penalties attach to violations of Section 78j by virtue of Section 78ff(a), which provides penalties for wilful violations of "any provision of this chapter" as well as for any wilful violation of "any rule or regulation thereunder ...."

Rule 10b–5 is no mere technical rule. Rather, it implements Section 10(b) of the Act, which makes illegal all manner of fraud. As stated repeatedly by the Supreme Court, Congress intended securities legislation enacted for the purpose of avoiding frauds to be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Securities and Exchange Commission v. Zandford,* 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)(quotations omitted).

Most significantly, Section 10(b) is virtually tracked in the language of Rule 10b–5, and the Supreme Court has stated that

"the scope of Rule 10b–5 is coextensive with the coverage of § 10(b)." *Zandford* at 816 n. 1, 122 S.Ct. 1899; *see United States v. O'Hagan*, 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997)("Liability under Rule 10b–5, our precedent indicates, does not extend beyond conduct encompassed by § 10(b)'s prohibition"); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (scope of Rule 10b–5 cannot exceed power Congress granted Commission under § 10(b)); *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("We have refused to allow [private] 10b–5 challenges to conduct not prohibited by the text of the statute.").

Thus, the defendants' pleas of guilty in this case to the charges in the information take them outside the protections of the "no knowledge" provision. Given their allocutions to conspiring to engage in acts which constitute securities fraud prohibited by Section 10(b) and Rule 10b–5, they simply cannot be viewed as intended beneficiaries of the statute.[1] In *United States v. Sloan*, 399 F.Supp. 982 (S.D.N.Y.1975), Judge Whitman Knapp found the "no knowledge" provision of Section 78ff(a) inapplicable to a defendant convicted after trial of conspiracy to violate 15 U.S.C. § 78q(a) and three SEC regulations promulgated thereunder which required that certain records by accurately made, preserved and filed. In doing so, Judge Knapp analyzed the purposes of the "no knowledge" provision in Section 78ff(a), as follows:

> This clause is rather unique in that it permits a defendant prior to sentencing to rebut the presumption that he had knowledge of the rule or regulation of which he had been convicted of violating. It was included in the 1934 Act as a compromise measure to allay certain fears in Congress that, by enacting a vast new securities statute giving broad rule-making authority to the SEC, and by making violations of such rules criminal, the legislators were subjecting totally "innocent" people—persons who might act without knowledge that their conduct was now prohibited by a rule—to possible incarceration. The compromise impliedly recognized that under such circumstances, strict adherence to the presumption of knowledge of the law would be unwarranted. *Sloan*, 399 F.Supp. at 984.

Judge Knapp went on to state:

> It is equally clear, however, that Congress did intend to maintain the usual presumption of knowledge with respect to the standards prescribed in the securities acts themselves. The "no knowl-
> edge" defense applies only to one's knowledge of the securities laws and that a defendant may not be imprisoned if he proves "no knowledge" of the Rule. However, as defendants conceded at oral argument, proof of "no knowledge" of the Rule can only mean proof of an ignorance of the substance of the Rule, proof that defendants did not know that their conduct was contrary to law. *See infra* at p. 204.

> In any event, all parties acknowledge, and this court has found, that defendants' factual allocutions in this case establish their wilful culpability of conspiracy to commit securities fraud.

---

**1.** Given the unique relationship between Section 10(b) and Rule 10b–5, and the fact that these provisions deal with fraud, with its inherent culpability, it seems difficult to imagine a case in which the "no knowledge" provision could be applicable to a criminal Rule 10b–5 violation, which requires wilfulness. *See* Clifton L. Brinson and Andrew D. Kaizer, "Criminal Intent, a Key but Ambiguous Issue," *N.Y.Law J.*, Nov. 17, 2003, at 9. In *O'Hagan*, the Supreme Court upheld a criminal conviction after trial of a Rule 10b–5 violation under a misappropriation theory, noting that criminal penalties require a showing of wilful (and not just reckless) violation

edge" proviso is explicitly limited to lack of knowledge of a "rule or regulation". Congress did not intend that the protection of the "no knowledge" clause would extend to persons who were charged with knowing their conduct to be in violation of law, but did not happen to know that it was also in violation of a particular SEC rule or regulation. *Id.*

■ Here, as in *Sloan*, none of these defendants is "a totally innocent person" who committed a mere technical violation of an SEC rule or regulation. *Id.* As the defense acknowledged at the hearing, the misappropriation theory of securities fraud liability does not involve the technical violation of a rule. They nonetheless argue that the use of that theory of liability relieves them of imprisonment because they had no knowledge of the misappropriation theory. This argument is meritless. Section 10(b) and Rule 10b–5 prohibit fraud. They leave "to the courts the task of defining the specific kinds of securities frauds." *United States v. Lilley*, 291 F.Supp. 989, 993 (S.D.Tex.1968). *See e.g. United States v. Falcone*, 257 F.3d 226 (2d Cir.2001). As defendants acknowledge, "proof of 'no knowledge' of the rule can only mean proof of an ignorance of the substance of the rule, proof that [defendants] did not know that their conduct was contrary to law." *United States v. Schwartz*, 464 F.2d 499, 509 (2d Cir.1972), *quoting Lilley* at 993. Whether or not defendants knew that they faced potential prosecution under a theory labeled by lawyers as the "misappropriation theory," they pled guilty to participating in a conspiracy to use stolen, non-public information to trade in securities to the harm of the investing public, conduct that is inherently culpable both because of the theft and because of the harm to which the information was put.

Defendants' reliance on *United States v. Eucker*, 532 F.2d 249 (2d Cir.1976), and *United States v. Colasurdo*, 453 F.2d 585 (2d Cir.1971), where the Second Circuit found the "no knowledge" provision inapplicable because the defendants were convicted of violating Section 78ff(a), and not just an SEC rule or regulation, is misplaced. If anything, these cases support the view that it is only violations of rules and regulations of the SEC, and not conduct that is inherently criminal, like the fraud committed here, which may give rise to "no knowledge" protections.

■ Even assuming that the "no knowledge" provision were available to the defendants, I find that defendants have failed to carry their burden to prove that they actually had no knowledge within the meaning of Section 78ff(a). Defendants agree that it is their burden to prove by a preponderance of the evidence that they meet the standard for application of the "no knowledge" provision. Defendants also agree that lack of knowledge of the specific rule violated is immaterial and that they must show lack of knowledge of the substance of the rule to which they pled guilty. In evaluating their credibility, I carefully observed their demeanor, their candor, or lack thereof, and the substance of their testimony.

Sonday and Knueppel each testified that they had no experience, academic, professional, or otherwise, that would have apprized them of the prohibition against selling stolen, confidential information to another for the purpose of purchasing securities. However, neither has shown by credible evidence that he or she was in fact unaware of this prohibition. Sonday and Knueppel each admitted being provided with, and signing, an employee handbook which explicitly prohibited employees from using the information contained in Perry's magazines and that violators of this policy could face criminal prosecution in addition to losing their

jobs. Although both Sonday and Knueppel denied reading the handbook, they each admitted that Perry also posted signs regarding the confidentiality policy and that they were aware of the possibility that violating the policy could result in the termination of their employment. Sonday admitted on multiple occasions during cross-examination that he knew his actions were illegal, and Knueppel conceded that it was "common sense" that they "shouldn't give out the information." They also admitted during the evidentiary hearing that they assumed Misfeldt and Tyrer wanted the misappropriated information to purchase stocks and that the use of the information provided Misfeldt and Tyrer an advantage, namely, to get the information before other traders. These admissions coupled with the fact that Sonday and Knueppel had to *steal* the information provided can only lead to the conclusion that they knew the information was not otherwise available and that Misfeldt and Tyrer were not entitled to have it.

I do not find credible, as I must if I am to accept Sonday's and Knueppel's position, that they did not know that Misfeldt and Tyrer's use of the information was illegal, despite the fact that Misfeldt and Tyrer were not entitled to the information. To accept Sonday's and Knueppel's version of events is to accept that they believed Misfeldt and Tyrer to be complete innocents; in other words, Knueppel and Sonday had to believe that the only wrong being committed was their theft and transmission of the information and not Misfeldt's and Tyrer's use of it. Sonday and Knueppel knew that Misfeldt and Tyrer were paying them cash for stolen information, and that the purpose was to get that information before it was publicly available. I cannot credit that Sonday and Knueppel thought that their own conduct was illegal but that Misfeldt's and Tyrer's was not.

Tyrer denies having any exposure to, or knowledge of, the Securities and Exchange Commission and its rules. Tyrer, during his testimony, indicated that he first realized that what he and the other defendants were doing could result in criminal sanctions when he stumbled across an internet article discussing *Falcone, supra.* Tyrer further indicated that, upon this discovery, he immediately contacted defendant Misfeldt, and they decided to discontinue the scheme. Tyrer denies ever reading, or seeing on the internet, any reference to the SEC or insider trading, ever receiving any warnings regarding the use of confidential information from the companies with whom he executed his trades or having any idea that his actions were illegal prior to reading the *Falcone* article.

The court does not credit Tyrer's claimed lack of knowledge that there were rules governing trading in securities and that securities fraud was illegal. Tyrer opened and established at least three day-trading accounts through which he engaged in both traditional stock purchases and more sophisticated short sales and margin trading. To help his understanding of the stock markets, Tyrer read magazines and internet articles regarding finance, and he discussed trading with Misfeldt, who was an avid reader of financial magazines. Tyrer admits to having paid Sonday and Knueppel for their information by mailing them cash. Finally, Tyrer admits to knowing that Sonday and Knueppel risked losing their jobs by selling the information. Despite this, Tyrer would have the court believe that he did not think there were any consequences attaching to his purchase and use of stolen information to the disadvantage of other investors. This position, much like that of Sonday and Knueppel, is not believable. Tyrer engaged in a sophisticated stock trading scheme through which he made over $1,000,000. In addition, Tyrer admitted to discussing the scheme

at length with Misfeldt. The court does not accept that Tyrer was unaware that securities fraud was illegal, and that his wildly profitable investment scheme premised upon buying stolen information to gain an advantage over other investors was inherently illegal. The use of cash indicates not only that Sonday and Knueppel did not want a bank record of the payments, but also that Tyrer did not want the payments traced to him. Tyrer's suggestion that cash was used because it was easier for Sonday and Knuepple, not because of any questionable business motive, is simply incredible in light of the surrounding circumstances.

**Conclusion**

For the above stated reasons, defendants' motions are denied, and they will not be allowed to rely on the "no knowledge" provision of 15 U.S.C. § 78ff(a) to avoid imprisonment.

**SO ORDERED.**