

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-10-2005

# Levine v. SEC

Precedential or Non-Precedential: Precedential

Docket No. 04-1049

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Levine v. SEC" (2005). *2005 Decisions.* Paper 1103.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1103

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-1049

———————

DAVID M. LEVINE, TRIPLE J PARTNERS, INC.,

Petitioners

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent

———————

On Appeal from an Order of
the Securities and Exchange Commission
(No.  0090-1)

———————

Submitted Under Third Circuit LAR 34.1(a)
April 4, 2005

Before: BARRY, AMBRO and COWEN, <u>Circuit Judges</u>

(Filed May 10, 2005 )

Evan M. Levow, Esquire
Pamela Moore, Esquire
Levow & Costello
1415 Route 70 East
Cherry Hill Plaza, Suite 200
Cherry Hill, NJ   08034

      *Counsel for Petitioners*

Giovanni P. Prezioso
  General Counsel
Meyer Eisenberg
  Deputy General Counsel
Eric Summergrad
  Deputy Solicitor
Dominick V. Freda, Esquire
Securities & Exchange Commission
450 Fifth Street, N.W.
Washington, D.C.  20549

      *Counsel for Respondent*

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

David Levine and Triple J Partners (collectively "Levine") petition for review of the decision of the Securities

2

and Exchange Commission ("SEC") sustaining (1) the determination of the New York Stock Exchange ("NYSE") that they had violated § 11(a) of the Securities Exchange Act of 1934 (hereinafter "Exchange Act") and SEC Rule 11a-1(a) (as well as various other SEC and NYSE rules), and (2) the NYSE's imposition of sanctions for those violations.[1] We deny the petition.

## I. Factual Background and Procedural History

Although many issues have been raised in this appeal,[2]

---

[1]For convenience, hereinafter we refer to the petitioners simply as "Levine" unless the context requires otherwise.

[2]In addition to challenging the SEC's decision that he violated § 11(a) and Rule 11a-1(a), Levine also argues that the SEC abused its discretion in finding that he: (1) received or agreed to receive a share of the profits and losses in the account at issue in violation of Exchange Rule 352(c); (2) received trade executions while not in the trading crowd in violation of Exchange Rule 117.10; (3) made material misstatements in his sworn testimony in violation of Exchange Rule 476(a); (4) allowed his badge number to be used for transactions in which he was not the executing broker; (5) permitted his clerks to transmit orders to a specialist that were not written market or limit price orders (*i.e.*, orders that were not in the proper form) in violation of Exchange Rule 123A.20; (6) failed to supervise his employees and failed to "reasonably supervise or control"

3

we discuss only the issue of (and therefore only the facts relating to) Levine's alleged violation of § 11(a) of the Exchange Act, 15 U.S.C. § 78k(a)(1), and its implementing regulation, SEC Rule 11a-1(a), 17 C.F.R. § 240.11a-1(a), as we discern nothing to add to the SEC's treatment of the other issues and certainly nothing that would cause us to question the SEC's rulings.

At the time of the events at issue in this case (1996 to 1998), David Levine was a lessee member of the NYSE, a self-regulatory organization registered under the Exchange Act. Levine was also the principal of Triple J Partners ("Triple J"), a partnership also a member of the NYSE. Levine was at this time an independent floor broker, commonly referred to as a "two-dollar broker," *i.e.*, for every 100 shares traded through him a commission of $2.00 was charged.

One of Levine's customers while he was a two-dollar broker was Tribeca Capital Corporation ("Tribeca"). Tribeca's principal, Timothy J. Barry, had been a friend of Levine's since the late 1980s. Tribeca also was a public customer of the Oscar

---

certain other business activities in violation of Exchange Rule 342; and (7) failed to keep accurate books and records in violation of SEC Rules 17A-3 and 17A-4 and Exchange Rule 440. Levine also argues that, even if the SEC did not abuse its discretion in sustaining the NYSE's determination that he was guilty of the above violations, the SEC did abuse its discretion in upholding the sanctions imposed by the NYSE.

Gruss & Sons ("Oscar Gruss") clearing firm.

Instead of placing orders for securities with Levine by first going through Oscar Gruss, as public customers like Tribeca must, Barry (for Tribeca) placed orders directly with Levine for shares of Putnam Intermediate Government Trust ("PGT"). The NYSE floor specialist who handled PGT was William Shanahan, who Levine testified was "one of [his] best friends." Shanahan allowed Levine to circumvent NYSE procedures for placing orders in PGT. Among other things, Shanahan at times allocated more stock to Tribeca than the volume that was indicated on the order list Levine gave Shanahan for PGT for a particular trading day. The NYSE investigator who conducted the investigation into Levine's conduct testified before the NYSE that Oscar Gruss (and thus Tribeca) had the bulk of the transactions in PGT for the sample period that he reviewed. The investigator also testified that he did not think it was necessary to conduct a profit/loss analysis of Tribeca's trades in PGT because, due to the way the trades were made (which he described as "buying at a low price and selling at the next available high price"), there was no way that there could have been a loss.

Levine claimed that he had a negotiated rate arrangement with Tribeca. According to him, such an arrangement meant that a customer could pay its broker whatever the customer wanted. Levine, however, also testified that he initially charged Tribeca a commission of $2.00 per 100 shares traded for it and

that the rate later increased to $3.00 per 100 shares when Tribeca switched from Oscar Gruss to a different clearing firm.

From February 1996 to August 1996, Levine received several overpayments from Tribeca. For example, in February 1996, he received from it $120,000 in payment even though, if Levine had been paid at his $2.00 per 100 shares rate, he would have been entitled to only about $32,000 in commissions. On the other hand, after Shanahan was removed from his position as a NYSE floor specialist, there was a five-month period (September 1996 to January 1997) during which Levine was paid nothing by Tribeca even though he was entitled to about $99,000 in commissions. The net, however, was that, from January 1996 to February 1998, Tribeca paid Levine about $330,000 more than he was entitled if paid at his claimed billing rates.

Levine testified that Tribeca was not the only customer that paid him whatever it wanted or that missed payments. He explained that when customers missed payments, it was usually because their money was tied up. He also speculated that when Barry (on behalf of Tribeca) sent him large overpayments, it was to make up for previous months when Tribeca had been unable to pay him.

During this time period, Levine introduced Robert Miller, another independent broker, to Barry and the Tribeca account. Miller testified before the NYSE that Levine told him he could

"make a lot of money with the account." Miller stated that he made trade executions for Barry (and thus Tribeca) every month during the relevant period but that he was not paid every month. According to Miller, he did not question Barry about this. He stated that he had "lost [Tribeca] money" and guessed that this was the reason he was not paid.

Miller received $25,000 in payment from Tribeca in July 1996 and testified that he was "amazed" at its size. When he asked Levine what he had done to deserve such a payment, Levine "kind of laughed, and then he said[,] [']I told you that if you did the right thing, he [Barry] would pay you off.[']" Later, in September or October of that year, Miller had another conversation with Levine concerning a large payment from Oscar Gruss. Miller testified that Levine explained to him that "[Tribeca] was paying [Miller] up to 70 percent of what [Miller] earned" and that if Miller wanted the payment in cash, the amount would be reduced to only 50 percent of what Miller earned for Tribeca.

The NYSE's expert witness, Joseph Cangemi, testified that payments to independent brokers are generally consistent and that brokers do not usually receive payments in excess of their bills. He also testified that, although customers do occasionally miss payments, "there is never a period where you get nothing consistently." Cangemi reviewed the charts reflecting Tribeca's payments to Levine and opined that there was no correlation between the payments and the work Levine

was doing for Tribeca. Cangemi noted that Levine was being overpaid by Tribeca by up to 400 percent in some months.

In June 2000, the NYSE brought charges against Levine and Triple J based on their conduct between January 1996 and February 1998. The NYSE Hearing Panel held thirteen days of hearings and unanimously found them guilty on all charges. The Hearing Panel also imposed sanctions on them, including a six-month suspension from membership in the NYSE and a fine of $100,000.

Levine and Triple J asked the NYSE Board of Directors to review the hearing panel's decision. The Board considered the record and written submissions by the parties and held oral argument. It summarily affirmed the "decisions of the Hearing Panel in all respects." Levine and Triple J then appealed to the SEC.

The SEC undertook an independent review of the record. It sustained (1) the NYSE's determination that Levine and Triple J violated the Exchange Act, SEC rules, and NYSE rules, as well as (2) the sanctions imposed by the NYSE. They now petition for review of that decision.

## II. Jurisdiction and Standard of Review

The SEC had jurisdiction to review the disciplinary action taken by the NYSE pursuant to §§ 19(d)(2) and 19(e)(1)

8

of the Exchange Act, 15 U.S.C. §§ 78s(d)(2), (e)(1). We have jurisdiction over the petition for review of the SEC's decision under § 25(a)(1) of the Exchange Act, 15 U.S.C. § 78y(a)(1).

"Commission findings of fact are conclusive for a reviewing court 'if supported by substantial evidence.'" *Steadman v. SEC*, 450 U.S. 91, 96 n.12 (1981) (quoting 15 U.S.C. § 78y); *see also MFS Secs. Corp. v. SEC*, 380 F.3d 611, 617 (2d Cir. 2004) (stating that the SEC's findings of fact must be affirmed if supported by substantial evidence); *Todd & Co., Inc. v. SEC*, 557 F.2d 1008, 1013 (3d Cir. 1977) (reviewing SEC opinion for substantial evidence). In addition, "[t]he Administrative Procedure Act, which applies to our review of Commission orders, provides that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *MFS Secs. Corp.*, 380 F.3d at 617 (internal quotation and citations omitted). The SEC's interpretation of ambiguous text in the Exchange Act is "entitled to deference if it is reasonable." *SEC v. Zandford*, 535 U.S. 813, 819–20 (2002) (citing *United States v. Mead Corp.*, 533 U.S. 218, 229–30 & n.12 (2001)).

### III. Discussion

Section 11(a) of the Exchange Act provides that "[i]t shall be unlawful for any member of a national securities exchange to effect any transaction on such exchange for its own

9

account, the account of an associated person, or an account with respect to which it or an associated person thereof exercises investment discretion . . . ." 15 U.S.C. § 78k(a)(1).  It is unclear from the plain language of this statute when an account will be considered the broker's own account.   Rule 11a-1(a), the implementing regulation, further provides:

> No member of a national securities exchange, while on the floor of such exchange, shall initiate, directly or indirectly, *any transaction in any security admitted to trading on such exchange, for any account in which such member has an interest*, or for any such account with respect to which such member has discretion as to the time of execution, the choice of security to be bought or sold, the total amount of security to be bought or sold, or whether any such transaction shall be one of purchase or sale.

17 C.F.R. § 240.11a-1(a) (emphasis added).  The Rule does not define what type of evidence will suffice to show that a broker has an interest in an account, but the SEC in Exchange Act Releases has set standards, discussed below, for when violations of § 11(a) and Rule 11a-1(a) are deemed to exist.

The SEC concluded here that Levine violated § 11(a) and Rule 11a-1(a) by executing trades for an account in which he had an interest—the Tribeca account.  The SEC's decision in

10

this case reiterated its position, taken previously in other, similar cases, that "where an Exchange member shares the economic risk of trades in another account, that member has an interest in the account" for purposes of the statute and rule. *See In re David M. Levine*, 81 SEC Docket No. 1782, Exchange Act Release No. 34-48670, 2003 WL 22570694, at \*9 (Nov. 7, 2003). The SEC concluded that this standard was met here because the pattern of overpayments to Levine from Tribeca during periods of consistently profitable executions in PGT, followed by periods of no payments or minimal payments even when Levine continued to perform substantial amounts of work for Tribeca, "although circumstantial, demonstrate[d] that [Levine was] sharing profits and losses with Tribeca." *Id.* In reaching this determination, the SEC found that "[t]he payments Tribeca made to [Levine] have no apparent relationship to [Levine's] commission rates." *Id*. at \*8.[3]

---

[3]The SEC decision recognized that the NYSE found not credible Levine's hearing testimony and noted that "[c]redibility determinations of an initial fact-finder are entitled to considerable weight and deference, since they are based on hearing the witnesses' testimony and observing their demeanor." *Levine*, 2003 WL 22570694 at \*5 n.21 (citing *In re Brian A. Schmidt*, 76 SEC Docket No. 2255, Exchange Act Release No. 34-45330, 2002 WL 89028, at \*2 n.5 (Jan. 24, 2002)). The SEC therefore gave deference to the NYSE's credibility determination.

11

Levine's main argument in the petition for review is that the circumstantial evidence presented to the SEC was insufficient to prove any of the charges against him, particularly the violations of § 11(a) and Rule 11a-1(a). He does not explicitly challenge the SEC's interpretation of those provisions as unreasonable, but does argue that the SEC should have considered the prevailing NYSE interpretation of § 11(a) at the time of the events at issue, found in a 1998 letter from Richard Grasso, then Chairman and CEO of the NYSE, to the SEC (the "Grasso letter"). It allegedly required proof of intent to violate § 11(a) and stated that sharing in the profits of an account did not, by itself, create an interest in that account.

As mentioned above, the interpretation of § 11(a) and Rule 11a-1(a) the SEC applied here—that a member has an interest in an account for purposes of those provisions where the member shares in the economic risk of trades in the account—has been articulated in prior SEC Exchange Act Releases dealing with conduct remarkably similar to Levine's. In *In re New York Stock Exchange*, 70 SEC Docket 106, Exchange Act Release No. 34-41574, 1999 WL 430863 (June 29, 1999), the SEC held that "any compensation arrangement that results in the exchange member sharing in the trading performance of an account, however structured, makes the account that member's 'own account,' or constitutes an 'interest' in the account, for purposes of Section 11(a) and Rule 11a-1." *Id.* at *3 (holding that the NYSE failed to enforce compliance with § 11(a) and Rule 11a-1(a) by failing to oversee

12

properly the conduct of independent brokers who were being compensated based on a percentage of their accounts' trading profits or losses). The SEC proceeded to hold individual brokers liable for violations of § 11(a) and Rule 11a-1(a) based on its interpretation of when a broker is considered to have an interest in an account. *See In re John R. D'Alessio*, 79 SEC Docket No. 2786, Exchange Act Release No. 47627, 2003 WL 1787291 (Apr. 3, 2003) (holding that broker violated § 11(a) and Rule 11a-1(a) when he shared in the profits and losses of trades in one of his customer's accounts); *see also In re Edward John McCarthy*, 81 SEC Docket No. 465, Exchange Act Release No. 48554, 2003 WL 22233276 (Sept. 26, 2003) (same).

We believe this interpretation is reasonable and entitled to deference. *See Zandford*, 535 U.S. at 819–20. Common sense tells us that, if a broker's compensation is tied to the performance of an account, he or she has an interest in that account. If the account does well, the broker does well, and *vice versa*. Thus, as a broker is clearly interested in maximizing his or her compensation, such a person is hardly neutral, for account performance affects his or her compensation. As the SEC explained in *D'Alessio*, a case where the broker "entered into an agreement with [a customer] that not only provided that he receive 70 percent of the trading profits, but also required him to contribute 70 percent of the trading losses in the [account]," this arrangement made the broker "a partner" in the account because the broker and the customer shared "in the economic risk of the trades." *D'Alessio*, 2003 WL 1787291 at *6.

13

Having determined that the SEC's interpretation of § 11(a) and Rule 11a-1(a) is reasonable, we turn to whether that interpretation was properly applied in this case. We address in turn each of Levine's arguments that it was not.

The SEC has previously dispensed with Levine's argument that it should have deferred to the NYSE's interpretation in the Grasso letter in determining whether he violated § 11(a). The pertinent section of the Grasso letter states that arrangements whereby "financial remuneration [to brokers] may be tied to the profitability of trading . . . have not typically been deemed to establish an ownership interest in a customer account for which brokerage service is performed." D'Alessio, like Levine, argued from this that, during the relevant time period, the NYSE condoned profit and loss sharing arrangements between brokers and their customers. The SEC rejected this argument, stating: "The letter, rather, reflects the Exchange's position that partnership relationships such as the arrangement that [D'Alessio] had with [his customer] in which the parties shared in not only the profits but the losses of each transaction—a traditional indication of ownership—were prohibited." *D'Alessio*, 2003 WL 1787291 at *10. Given that the letter does not indicate that the NYSE would condone a compensation arrangement in which both profits *and* losses in account were shared by a broker, the SEC's interpretation of the letter is a rational one. Therefore, Levine's reliance on the

14

Grasso letter is unpersuasive.[4]

Levine also cited the Grasso letter in support of his argument that intent is required for a violation of § 11(a). The letter stated that, in the view of a NYSE committee investigating the trading practices of independent brokers, "it would be necessary to establish a broker's intent before it would be possible to conclude that the broker was a 'partner' in an account for purposes of Section 11(a)." Even if Levine is correct that his intent must have been established to prove a violation of § 11(a) and Rule 11a-1(a), his argument that he lacked the requisite intent (and that the SEC's decision must therefore be overturned) is wanting. Both the NYSE and the SEC refused to credit Levine's denials regarding his knowledge

---

[4]Notably, the Grasso letter also does not state that a compensation arrangement tied to profitability could never be considered to establish a broker's interest in a customer's account. Rather, it asserts that such an arrangement "typically" would not be deemed to show an ownership interest. The letter also reiterated a NYSE committee's conclusion "that if a broker is compensated for his or her services based on the profitability of transactions in such a way that he or she becomes, in effect, a 'partner' with his or her customer in the trade, such broker may become subject to the restrictions contained in Section 11(a) as to proprietary trading by Exchange members."

15

of why he was being overpaid and then underpaid by Tribeca.[5] In addition, Miller's testimony that Levine introduced him to the Tribeca account, and told him that he was being paid based on a percentage of what he earned for the account, supports well the conclusion that Levine acted knowingly with regard to his own similar compensation arrangement with Tribeca. Indeed, Levine points to no evidence that would lead us to disturb the SEC's findings on this issue.

Finally, we are left with Levine's argument that the circumstantial evidence in this case was insufficient to support the SEC's determination that he violated § 11(a) and Rule 11a-1(a). In making this argument, Levine essentially asks us to credit his version of events. However, Levine's speculation that the overpayments he received from Tribeca might have been made to compensate him for prior missed payments takes not the first step in convincing us to conclude that the SEC's decision should be overturned. As the SEC stated in rejecting this same

---

[5]In particular, the NYSE stated: "To accept Mr. Levine's denials of these facts, the Hearing Panel would have to believe that Mr. Levine accepted the customer's gross overpayments without clear knowledge of the reasons for such overpayments; that he similarly tolerated a long period of non-payment; [and] that he never explained to a broker to whom he had introduced the customer that the customer paid on the basis of profits. We do not give credence to Mr. Levine's denials and claims of ignorance."

16

argument when it was raised before the Commission:

> We believe that the seven fact witnesses and one expert witness who testified for the Exchange, together with the exhibits, demonstrated that [Levine and Triple J] had an interest and were sharing profits in the Tribeca account. The arrangements between [Levine and Triple J] and Shanahan resulted in consistently profitable executions for Tribeca during the time Shanahan was the PGT specialist. During the same period [Levine and Triple J] received correspondingly large over-payments from Tribeca. As soon as Shanahan was removed, and for two months thereafter, [Levine and Triple J] did not receive any PGT executions. Although they performed substantial work for Tribeca over the next five months, they received no or minimal payments. We believe that this pattern, although circumstantial, demonstrates that [Levine and Triple J] were sharing profits and losses with Tribeca.

*Levine*, 2003 WL 22570694 at *9. In the face of this substantial evidence undergirding the SEC's conclusion that Levine shared in the profits and losses of the Tribeca account and thus violated § 11(a) and Rule 11a-1(a), we decline to disturb the SEC's findings.

17

## IV. Conclusion

To recap, the SEC's findings of fact are conclusive if supported by substantial evidence, its actions cannot be set aside unless they are arbitrary and capricious, and its interpretations of the Exchange Act are entitled to deference if they are reasonable. The SEC's interpretation of § 11(a)—that it is violated when a broker trades in an account in which he or she has an interest and that sharing in the economic risk of trades in an account is tantamount to having such an interest—is reasonable and we defer to that interpretation here. When a broker shares in the profits and losses of an account, it effectively becomes in part his or her account, thus bringing the broker within the ambit of § 11(a). In this case, as in *D'Alessio*, the pattern of overpayments to Levine when he was making profitable executions in PGT for Tribeca, and the lack of any payments at all for other periods of time, strongly show that Levine shared the economic risk of trading in the Tribeca account. *Cf. D'Alessio*, 2003 WL 1787291 at *3. Levine's arguments to the contrary underwhelm, as do his arguments regarding the portions of the SEC decision dealing with violations of other SEC and NYSE rules and the imposition of sanctions. Accordingly, we deny the petition for review.