In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-2905

KETAN PATEL,

*Plaintiff-Appellee*,

*v.*

MAHENDRA WAGHA and PORTFOLIO DIVERSIFICATION GROUP, INC.,

*Defendants-Appellants*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 468 — **Sara L. Ellis**, *Judge*.

_____

ARGUED FEBRUARY 23, 2017 — DECIDED AUGUST 9, 2017

_____

Before POSNER, EASTERBROOK, and MANION, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Ketan Patel saved about $560,000, enough to purchase a 7-Eleven franchise. Until the deal closed, he parked the money with Portfolio Diversification Group. The contract gave Mahendra Wagha discretion over the funds' deployment. Wagha chose to invest much of the money in options, speculating that the market would

rise. By the time Patel needed the funds (four months after investing them), the market was down and he had lost a considerable sum. A jury concluded that Wagha and Portfolio (collectively "the Dealers") had broken their promise to invest the money conservatively, and its verdict awarded Patel $136,000 for breach of contract plus a further $64,000 for securities fraud, for a total of $200,000. The district court remitted the $64,000 award, ruling that Patel has not shown loss causation, but entered judgment on the $136,000 award. 2016 U.S. Dist. LEXIS 74983 (N.D. Ill. June 8, 2016). The Dealers have appealed; Patel has not.

The Dealers contend that, as soon as the district court resolved the only claim arising under federal law, it lost subject-matter jurisdiction and had to dismiss the state-law claim too. (The litigants are not of diverse citizenship.) That's wrong. District judges can use the supplemental jurisdiction, 28 U.S.C. §1367, to resolve state-law claims even after all federal claims have been dismissed. The state and federal claims were tried together; it was entirely appropriate to enter judgment on the state-law claim under §1367.

What's more, the federal-law claim should not have been dismissed. The district judge observed that damages based on the SEC's Rule 10b–5, 17 C.F.R. §240.10b–5, depend on proof of "loss causation," *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which the judge understood to mean proof that the securities were not worth what the buyer paid for them. The record does not show that any of the options the Dealers bought in Patel's account was mispriced. But the premise of the district court's holding—that the securities laws are concerned only with inaccurate pricing—is incompatible with *SEC v. Zandford*, 535 U.S. 813 (2002), and

*United States v. Naftalin*, 441 U.S. 768 (1979), which hold that the securities laws forbid fraud in all aspects of securities transactions, whether or not the fraud affects the instruments' prices. See also, e.g., *Holtz v. JPMorgan Chase Bank, N.A.*, 846 F.3d 928 (7th Cir. 2017).

Liability under Rule 10b–5 depends on fraud, which can take many forms. One kind of fraud is procuring securities known to be unsuitable to a client's investment goals, after promising to further those goals. See, e.g., *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir. 1993). This is the kind of fraud that Patel showed to the jury's satisfaction. Buying options caused Patel loss in the sense that the options, as highly leveraged instruments, fared materially worse than safer investments such as a diversified portfolio of stocks or bonds. The difference between how the options fared, and how the instruments the Dealers should have bought fared, is a loss caused by the securities fraud. Because Patel has not appealed we cannot reinstate the full verdict, see *Greenlaw v. United States*, 554 U.S. 237 (2008), but district judges should avoid this kind of error in the future.

On the merits of Patel's contract claim, the Dealers' principal argument is that the evidence used to show Patel's investment goals is incompatible with the contracts he signed when opening his account. The Dealers identify two kinds of incompatibility. First, they observe, the contracts allow them to purchase many kinds of instruments, including options. This necessarily establishes that Patel consented to high-risk investments, the Dealers maintain. Second, the contracts contain integration clauses—that is, they say that the written language supersedes any prior oral exchanges. The Dealers

insist that any reference to what Patel told Wagha must be excluded under the integration clauses.

The first branch of this argument reflects a common misunderstanding about options and other leveraged derivative instruments, such as futures contracts. Derivatives *can* be used to speculate, which is how Wagha used them. An investor (or agent) hoping that the market will rise can use derivatives to multiply the gain if prices go up, at the cost of multiplying the loss if they go down. But derivatives also can be used to hedge risk. Wagha could have used most of Patel's money to buy a diversified basket of stocks and then bought options that would have made money if the market fell; gains from those options would have offset any losses from the securities and so made Patel's investment safer. The fact that options can mitigate risk by hedging, as well as augment risk by speculation, means that a client's assent to options trading does not imply agreement to take extra risk. It means agreement to the sort of options trading suitable to the client's investment goals. And if, as the jury found, Patel told Wagha that his goal was to protect his principal, then what Patel consented to was the use of options to hedge risk.

As for the integration clauses: If Patel were trying to use parol evidence to contradict any language in the contracts, he would be out of luck. But that's not the burden of his trial testimony. The principal contract authorizes the dealers to make investments "designed to seek investment return suitable to the Investment Objectives and goals of the Client." It does not, however, say what Patel's goals are—nor does any other writing signed by the parties. The contracts therefore anticipate that some other means, such as oral exchanges or emails, will be used to specify those goals. Testimony about

what Patel said or sent to Wagha therefore does not contradict the contracts.

That it should be necessary to hold a trial to find out what Patel said to Wagha surprises us. Broker-dealers routinely record these conversations, not only to ensure that they carry out clients' wishes but also to protect themselves in the event recollections diverge. Portfolio Diversification Group did not record these exchanges, however, so the only way to resolve the disagreement was to put the matter to a jury, which found in Patel's favor. The judgment is supported by ample evidence and therefore is

AFFIRMED.