Samuel **COOPER**, Albert Ferguson, and Herbert H. Miller, Jr., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**PACIFIC LIFE INSURANCE COMPANY and Pacific Select Distributors, Inc., Defendants.**

**No. CIV.A. CV203–131.**

United States District Court, S.D. Georgia, Brunswick Division.

May 9, 2005.

246

248

Brian C. Kerr, Janine L. Pollack, Lee A. Weiss, Michael Champlin Spencer, Milberg, Weiss, Bershad & Schulman, LLP, New York City, John B. Long, Thomas W. Tucker, Tucker, Everitt, Long, Brewton & Lanier, PC, Augusta, GA, for Plaintiffs.

James R. Carroll, Kurt Wm. Hemr, Skadden, Arps, Slate, Meagher, Flom LLP, Boston, MA, Lisa Godbey Wood, Wallace E. Harrell, Gilbert, Harrell, Gilbert, Sumerford & Martin, PC, Brunswick, GA, for Defendants.

### ORDER

ALAIMO, District Judge.

## TABLE OF CONTENTS

BACKGROUND ....................................................249

DISCUSSION ....................................................251

I.  Theories of Liability in the Case ...........................................251
    A.  Failure to Disclose the Redundancy of Tax–Deferral ........................251
    B.  Omissions Related to Suitability Determinations ...........................252

II. Class Certification Under Rule 23 ...........................................256
    A.  Requirements of Rule 23(a)...............................................257
        1.  Numerosity ........................................................257
        2.  Commonality.......................................................257
        3.  Typicality ........................................................258
        4.  Adequacy of Representation ........................................258
    B.  Requirements of Rule 23(b)(3) ..........................................259
        1.  Common Issues of Law and Fact Predominate .........................259
            a.  Applicable Considerations......................................259
            b.  Analysis .....................................................260
                i.  The Class May Not Be Certified Based on an Agency Theory.....260
                ii. Certification is Appropriate Based on Pacific Life's Common
                    Course of Conduct .........................................260
        2.  The Class Device is the Superior Method of Adjudication .................265

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .266

Plaintiffs, Samuel Cooper, Albert Ferguson, and Herbert H. Miller, Jr., filed the above-captioned case against Defendants, Pacific Life Insurance Company and Pacific Life Distributors, Inc. (collectively, "Pacific Life," the "issuer," or the "insurer"), pursuant to §§ 10(b) and 29(b) of the Securities and Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78cc(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated under § 10(b) of the Act.

The case is before the Court on Plaintiffs' motion to certify the class. Because the requirements of Rule 23 are met, the motion will be **GRANTED.**[1]

### BACKGROUND

Cooper, Ferguson, and Miller purchased variable annuity contracts from Pacific Life through Carol Hanlon, a registered representative of an independent NASD-registered broker-dealer, Salomon Smith Barney.[2] Plaintiffs purchased the annuities for their Individual Retirement Accounts ("IRAs"), using rollover funds from the retirement plan operated by their former employer, Georgia Pacific Corporation. Each Plaintiff received a prospectus with his annuity.

> A variable annuity is an insurance contract that is subject to regulation under state insurance and [federal] securities laws. Although variable annuities offer investment features similar in many respects to mutual funds, a typical variable annuity offers three basic features not commonly found in mutual funds: (1) tax-deferred treatment of earnings; (2) a death benefit; and (3) annuity payout options that can provide guaranteed income for life.

National Association of Securities Dealers ("NASD") Notice to Members 99–35.

The gravamen of Plaintiffs' complaint is that Defendants failed to disclose to them that the tax-deferral aspect of the variable annuity was redundant, and that Defendants failed to ensure that proper suitability determinations were made with respect to their purchases.

Cooper, Ferguson, and Miller seek to bring the action on behalf of all persons who purchased an individual variable annuity contract from Pacific Life, between August 19, 1998, and April 30, 2002, to fund a contributory retirement plan or arrangement qualified for favorable tax treatment under the Internal Revenue Code, codified in pertinent part at 26 U.S.C. §§ 401, 403, 408, 408A, or 457 (collectively, "qualified plans").[3]

Qualified plans, like IRAs and 401(k)s, have annual contribution limits. Variable annuities may be attractive to investors who have already made the maximum contribution to their qualified plans, and who want to invest extra income on a tax-deferred basis. Plaintiffs contend that the variable annuity's tax shelter is the sole reason that it exists in the marketplace. However, Defendants argue that the variable annuity's other features, such as lifetime income payments (or "annuitization") and the death benefit, attract qualified plan investors.

When a contract owner, or annuitant, purchases a variable annuity, he selects from an array of sub-accounts, which are similar to typical mutual fund offerings, in which to allocate his investment dollars. During the first several years of the contract, if market returns are favorable, the annuitant's account increases in value. This is referred to as the "accumulation phase." Later, the annuitant begins drawing money from the account, during what is known as the "payout phase."

The death benefit is paid to the contract owner's beneficiary if the annuitant dies dur-

---

1. Cooper, Ferguson, and Miller also move to be appointed as class representatives, and move for the appointment of Milberg Weiss Bershad & Schulman LLP ("Milberg Weiss") as class counsel, and Tucker, Everitt, Long, Brewton & Lanier, P.A., as liaison class counsel. The motions for the appointment of the class representatives and class counsel will be **GRANTED**.

2. This is typical of how class members purchased Pacific Life variable annuities—through thousands of selling agents, usually registered representatives of various broker-dealers throughout the country.

3. Two common types of qualified plans are IRAs and 401(k)s.

ing the accumulation phase and the underlying investments have decreased in value below the contract owner's initial investment(s). The insurance company pays the beneficiary the difference between the initial premium payments and the account balance, excluding any early withdrawals.[4] Consequently, the annuitant may choose a riskier investment allocation strategy in an attempt to achieve higher returns. Joint SEC/NASD Report on Examination Findings Regarding Broker–Dealer Sales of Variable Insurance Products 5–6 (June 2004), Micciche Decl., Ex. K.

Annuitization allows an annuitant, when ready to take withdrawals, to choose, instead of a lump sum distribution, a stream of fixed payments guaranteed to last the rest of her life, or for a fixed number of years.[5] The purchase of a tax-deferred variable annuity is not the only way to generate lifetime income payments—a mutual fund investor within an IRA could purchase an immediate annuity contract when she is ready to start receiving income. Rather, in terms of the annuitization feature, the advantage of the variable annuity is that it provides convenience, as the consumer need not go out into the marketplace at a later date and find a provider for this service.

According to the media reports submitted by Pacific Life, only an estimated one to three percent of variable annuity holders choose to take their distributions in lifetime income payments. Deborah Lohse & Bridget O'Brian, *Lawyers Seek Class Action Against Insurers Over Annuities*, Wall St. J., Nov. 9, 1999, at C15; Ron Panko, *Can Annuities Pass Muster?*, Best's Rev. 103, 108 (July 2000), Pacific Life's Statute of Limitations App. (Part 2 of 2) Tabs 67 & 94, respectively.

In internal valuations, Pacific Life placed no economic value on this feature of its product. Indeed, according to Pacific Life Vice President and chief actuary, Jeff Jolley, chances are that the insurer would stand to gain if more customers chose the annuitization feature over a lump sum distribution. Jolley Dep. 19, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 9.

Plaintiffs aver that Defendants were motivated by pecuniary gain to sell the annuities without disclosing that the tax shelter was of no value to them. Cooper, Ferguson, and Miller contend that higher fees, and surrender penalties,[6] add up to substantial profits, in excess of what can be gained by selling mutual funds. This added layer of "mortality and expense fees,"[7] plus administrative fees, is assessed at 1.4% of the account's value on an annual basis.[8] Bakos Decl. ¶ 16.

---

4. At least three of the named Plaintiffs, and perhaps all class members, had a variant of the basic death benefit. Merrill Report 6, Pacific Life's Aff. & Dep.App., Tab 1. Miller, Ferguson, and David Nelson, each had a death benefit with an annual "step-up" feature. That is, on each anniversary of the plan's inception date, if the account balance had increased, the account's increased balance was "locked-in," and the beneficiary would receive this greater amount, if the death benefit feature became applicable.

5. The stream of payments may also be variable, perhaps increasing in later years to account for inflation.

6. Surrender penalties are paid by the customer during the first seven years of the contract, if she wants to take money out of the annuity, on any withdrawals (other than any earnings, and ten percent of the premium payments, which may be withdrawn annually free of charge). The first three years the contract is in force, the surrender penalty is seven percent of the account's value. The fourth year, the surrender penalty decreases to six percent, decreasing in the final three years to five percent, three percent, and one percent,

respectively. Pacific Life's Sales Guide 8–9, Pacific Life's Sales Literature App., Tab 1.

7. The mortality and expense annual fees are in addition to fund management fees. Fund management fees are also incurred with mutual fund investments. In actively managed mutual funds, fund management fees compensate the professional investment analysts and fund managers for researching companies, researching market, monetary, regional, or country-specific risks, and for other analyses that professionals utilize to select stocks and other investments. Fund management fees vary widely, but, according to Pacific Life's expert, Brigham Young University Associate Professor of Finance, Craig Merrill, the fees are somewhat less at Pacific Life than those that are charged on comparable mutual funds. *See* note 14, *infra*. *See also* Jolley Dep. 26–30, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 9 (describing fees).

8. This is also expressed in the industry as 140 basis points, where 1 basis point equals .01%.

Over 10 years, for example, a retirement-plan investor with $100,000 in an annuity with typical fees would earn $8,950 less than if his money was in the average stock mutual fund, assuming a 10% annual investment gain, according to Morningstar, Inc., a fund-research firm.

Lohse & O'Brian, *supra*, at C1, Pacific Life's Statute of Limitations App. (Part 2 of 2), Tab 67. Over the course of several years, the extra fees could reach tens of thousands of dollars for individual class members.

Nelson and Cooper filed this action in August 2003, and filed an amended complaint in February 2004. In July 2004, the Court denied Pacific Life's motion to dismiss as to Plaintiffs' claims under § 10(b), and Rule 10b–5, promulgated thereunder, and § 29(b) of the Exchange Act.[9] In March 2005, the Court heard oral argument from the parties on Plaintiffs' motion for class certification.

## DISCUSSION

### I. *Theories of Liability in the Case*

It is necessary to analyze Plaintiffs' theories of liability before reaching the class certification issues, as some of these matters were not developed fully by Plaintiffs, or treated by the Court, at the motion to dismiss stage of the proceedings. A full understanding of these matters will also serve to clarify the propriety of class treatment of Plaintiffs' claims.

The 1933 and 1934 Acts "embrace a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). "[W]e read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face." *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

■ While the Court must look to the statute itself to determine the scope of con-duct prohibited under § 10(b), the law "must be read flexibly, not technically and restrictively." *Id.* at 12–13, 92 S.Ct. 165; *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 173–75, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Any plaintiff who suffers an injury caused by deceptive practices in the sale of securities states a claim entitling him to relief. *Dura Pharm., Inc. v. Broudo,* No. 03–932, 2005 WL 885109, at *4–7 (2005).

■ A variable annuity is a "security" within the meaning of the federal securities law. *SEC v. Variable Annuity Life Ins. Co. of Am.,* 359 U.S. 65, 67–73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 109 (2d Cir.2001).

The tax disclosure and suitability determination issues overlap in the case *sub judice.* The disclosure that Plaintiffs claim Defendants should have made in the prospectus, regarding the redundancy of the tax shelter aspect of the variable annuity, encompasses the idea that the product would not be suitable for widespread use within qualified plans. Also, Plaintiffs argue that the omission in the prospectus decreased the likelihood that they, or the registered representatives, would be able to determine that the product was unsuitable for placement within their qualified plans.

On the other hand, the tax disclosure and suitability determinations are distinct theories on which Plaintiffs attempt to hold Pacific Life liable. Defendants could not make individual suitability determinations for customers in the prospectus, which is the source of liability asserted for the failure to disclose the redundancy of the tax shelter aspect of the product. It suffices to say that the Court will treat the tax disclosure and the suitability determination aspects of the case separately, to the extent practicable.

### A. Failure to Disclose the Redundancy of Tax–Deferral

Cooper, Ferguson, and Miller complain that Pacific Life failed to disclose that the tax-deferred status of variable annuities was

---

**9.** On October 8, 2004, Nelson withdrew as a named Plaintiff due to failing health.

unnecessary when used within class members' qualified plans. This omission could constitute a violation of Rule 10b–5. *See* July 12, 2004 Order 11–13, Doc. No. 31.

■ Where a misleading statement is made in connection with a securities transaction, there is no requirement of showing a specific, fiduciary, duty to disclose. In the sale of its hybrid insurance-security products, Pacific Life must refrain from making any materially misleading statements, in its prospectus, or otherwise. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 861 (2d Cir. 1968)(en banc); *Heit v. Weitzen*, 402 F.2d 909, 913 (2d Cir.1968).[10]

In *Heit*, the Second Circuit considered a group of consolidated cases. In reversing the district courts' dismissal of the complaints, the court of appeals found that the purchasers of Belock Instrument Corporation's stock and debenture bonds, who had invested in the company in reliance on misleading financial statements, stated a claim for relief under Rule 10b–5. Belock's financial statements were misleading because the statements failed to disclose that the company derived significant income from overcharging on government contracts. *Id.* at 911. The district courts dismissed the complaints for two reasons: First, it was thought that the fraud did not occur "in connection with"[11] the purchase or sale of any security because the courts considered the company's fraud to be directed against the government, not Belock's own investors. Second, because the company itself did not buy or sell its securities, one of the district courts had found that there could be no liability under Rule 10b–5. *Heit*, 402 F.2d at 913.

The Second Circuit rejected these arguments, explaining:

[T]he Court in *Texas Gulf Sulphur* construed the "in connection with" require-

ment broadly and held that the clause was satisfied whenever a device was employed "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities[.]" There is no necessity for contemporaneous trading in securities by insiders or by the corporation itself. "Rule 10b–5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public ... if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes."

*Id.* (quoting *Texas Gulf Sulphur Co.*, 401 F.2d at 860, 861).

■ While the language prohibiting fraud "in connection with" the sale of a security may not be read so broadly as to make every common law fraud action a violation of § 10(b), *SEC v. Zandford*, 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), the misrepresentation need not concern the *value* of the "security in order to run afoul of the Act," *id.See generally*, Lewis D. Lowenfels & Alan R. Bromberg, *Rule 10b–5's "In Connection With": A Nexus for Securities Fraud*, 57 Bus. Law. 1 (2001).

In the instant case, the alleged omission regarding the usefulness of the tax shelter aspect of the product within a qualified plan clearly concerns the value of the security, and the statements were made "in connection with" the sale of the variable annuity. Consequently, Defendants may be liable for the failure to make an adequate tax shelter disclosure within the prospectus.

**B. Omissions Related to Suitability Determinations**

■ A failure to make a suitability determination can constitute securities fraud un-

---

**10.** To that extent, the Court's citation to *Chiarella v. United States*, 445 U.S. 222, 234–35, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), in the Order denying the motion to dismiss, was inapposite, as those cases involved insider trading and public statements concerning a merger, not allegations of material omissions in a prospectus. *Kennedy v. Tallant*, 710 F.2d 711 (11th Cir.1983); *Rose v.*

*Arkansas Valley Env't & Util. Auth.*, 562 F.Supp. 1180, 1206–08.(W.D.Mo.1983).

**11.** Rule 10b–5 makes it unlawful for a person, "in connection with" the sale of a security, to "omit to state a material fact necessary to make the statements made, in light of the circumstances ..., not misleading[.]" 17 C.F.R. § 240.10b–5(b) (2004).

der § 10(b). *See, e.g., Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 599–600 (2d Cir.1978); *O'Connor v. R.F. Lafferty & Co., Inc.,* 965 F.2d 893, 896–97 (10th Cir.1992) (discussing suitability violations in broker-investor context); *see generally,* Lewis D. Lowenfels & Alan R. Bromberg, *Suitability in Securities Transactions,* 54 Bus. Law. 1557 (1999). While liability for suitability violations, in the past, has been imposed on broker-dealers, premised on the so-called "shingle theory," [12] those decisions are instructive in determining the propriety of imposing a similar duty on the part of the issuer in the context of variable annuity sales.

The first aspect of Plaintiffs' suitability theory of liability concerns the lack of "suitability reviews" by Pacific Life. One of the last steps in the sale of a variable annuity into a qualified plan is the annuity issuer's review and approval of the customer's application. Plaintiffs contend, and Pacific Life does not deny, that the insurer is wholly responsible for selecting the information it requires to be submitted to issue an annuity contract. Cooper, Ferguson, and Miller assert that this gives Pacific Life the means to ensure suitable sales. Plaintiffs assert that at the final review stage, Pacific Life failed to stop or question improper or doubtful sales to guarantee informed choice by investors.

The second part of Plaintiffs' suitability claim concerns a lack of "suitability oversight." Plaintiffs maintain that Pacific Life made no effort to supervise its agents to ensure that its products were sold in a suitable manner, other than to assert in selling agreements, into which Pacific Life enters with its agents, that the agents must conduct suitability determinations. *See* Selling Agreement 2–4, Griggs Aff., Ex. A. Cooper, Ferguson, and Miller contend that Pacific Life's contractual requirement that suitability determinations be made by the broker-dealer is an implicit recognition that the issuer is ultimately responsible for verifying suitable sales.

Plaintiffs posit that the deposition testimony of Adrian Griggs, Pacific Life's Vice President of Finance and Compliance, Annuities and Mutual Funds Division, underscores Defendants' lack of internal procedures to determine whether suitability determinations were made by their selling agents. Griggs testified that Pacific Life did not review or audit broker-dealers' compliance procedures to verify that the suitability determinations were made, explaining that Pacific Life relied on its agents and customers to make these decisions. Griggs Dep. 14–16, 22, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 7.

In contrast with Griggs' expectations of Pacific Life's agents, Plaintiffs offered evidence that broker-dealers expect such oversight. Vincent Micciche is the CEO and Chief Compliance Officer of Lifemark Securities Corp., a company registered with the SEC and the NASD as a securities broker-dealer. Micciche filed a declaration on behalf of Plaintiffs' certification motion, in which he explained that broker-dealers rely on insurance companies to train agents on the complex sales conduct issues that are unique to variable annuities.

To contrast the variable annuity to the more familiar mutual fund, Plaintiffs contend that Pacific Life should have offered its selling agents actuarial data regarding the value of the death benefit. If registered representatives understood that this feature was worth 5.8 basis points, but that Pacific Life was being paid 140 basis points for this feature, Plaintiffs argue that it is logical to assume that selling agents would be unwilling to suggest to the vast majority of clients that they consider placing a variable annuity inside a qualified plan.

" 'There's a heavy burden that has to be overcome to justify that product in a tax-deferred plan,' says Paul Roye, director of the SEC's investment management division." Lohse & O'Brian, *supra,* at C15, Pacific Life's Statute of Limitations App. (Part 2 of 2), Tab 67.

**12.** The shingle theory is "[t]he notion that a broker-dealer must be held to a high standard of conduct because by engaging in the securities business ('hanging out a shingle'), the broker-dealer implicitly represents to the world that the conduct of all its employees will be fair and meet professional norms." Black's Law Dictionary 1410–11 (8th ed.2004).

Cooper, Ferguson, and Miller have submitted evidence showing that about half of the variable annuities sold by Pacific Life during the class period were placed in qualified plans. Sealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 1. According to Plaintiffs, this fact should have raised red flags at Pacific Life about rampant, widespread suitability violations in the sale of its variable annuity products, and should have triggered increased oversight by the issuer to ensure that investors were not defrauded into buying the annuities. Micciche Decl. ¶¶ 21, 30.

Cooper, Ferguson, and Miller also allege that there was a considerable undertaking by the insurer to get investors that were rolling over retirement funds into an IRA to purchase a Pacific Life variable annuity, without disclosing that the tax-deferral feature of the product was superfluous. Am. Compl. ¶¶ 29–50. Plaintiffs have submitted documentary evidence that supports these allegations. In an internal memorandum written by Pacific Life Assistant Vice President of Advanced Marketing, Reed Lloyd, he states that it "should be no surprise" that Pacific Life sold so many variable annuities into rollover IRAs because that is where the company had focused its marketing efforts. Sealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 1. Likewise, an internal marketing document suggests that the company sought out qualified plan investors through a "Total Solution" marketing campaign. Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 2.

Another document that may support Plaintiffs' contention that Pacific Life endorsed variable annuities as generally suitable for use within qualified plans is a PowerPoint presentation by Gregor Darm entitled "Overcoming Objections." Darm, Pacific Life's Internal Wholesaler Training Supervisor, was responsible for training Pacific Life employees on how to get registered representatives to recommend variable annuities to their customers.

One slide in the "Overcoming Objections" presentation was entitled "VA in a Qualified Plan." This title was followed by a bullet point accompanied by the statement: "Double Tax-deferral...So what?" Darm Aff., Pacific Life's Aff. and Dep.App., Tab 3A. The slide goes on to describe what Darm contends to be the product's redeeming features, which make it suitable for use in a qualified plan.

Based on these documents, it appears that this may not have been a case of ignorance at the issuer's headquarters regarding registered representatives' improper sales practices. Instead, the evidence permits an inference that there was a willful orchestration of the alleged suitability violations by Pacific Life.

The evidence presented shows that the agents and principal reaped sizable profits from selling variable annuities, when compared with mutual funds. If market participants exploit the complicated nature of a financial product, which they themselves designed, at the hands of ordinary investors, the anti-fraud provisions of the federal securities law serve as a significant check to ensure that sales resulting from unscrupulous, fraudulent suitability practices are not made with impunity.[13]

Pacific Life maintains that variable annuities may be suitable for use within qualified plans in certain instances, and that it should not be responsible for determining when those instances occur. The insurer states that the death benefit protects against stock market loss, and from 2000 through 2002 (part of the class period, and a time in which technology stocks, in particular, lost significant value), the insurer paid an average death benefit of $12,750 per claim. Jolley Aff. ¶ 8, Pacific Life's Aff. & Dep. App., Tab 2.

Defendants' expert, Merrill, opined that low fund management fees and the death benefit feature could make the variable annuity attractive to qualified plan investors. Merrill found that the death benefit had an average expected value of $1,418, per $100,000 invested, during the class period.

---

13. "Inexplicably, the percentage of annuities being sold into qualified plans has actually increased since 1998." Michael J. Borden, *PSLRA,* *SLUSA, and Variable Annuities Overlooked Side Effects of a Potent Legislative Medicine,* 55 Mercer L.Rev. 681, 735 (2004).

Merrill Report, Pacific Life's Aff. & Dep. App., Tab 1D.

Although Merrill did not convert the $1,418 figure to an "annual basis points" figure, Plaintiffs' expert has done so. According to Tom Bakos, principal of an actuarial consulting firm, Merrill's calculation comes out to 5.8 basis points annually. Bakos Decl. ¶ 9. Defendants have not challenged this characterization of Merrill's actuarial analysis. Similarly, prior to this litigation, Pacific Life's actuaries estimated the death benefit feature at 13 basis points per annum.

Plaintiffs contend that an expected value of 5.8 basis points is a poor return in exchange for the 140 basis point fee paid by class members. Cooper, Ferguson, and Miller assert that, generally, informed investors would not use a variable annuity to fund a qualified plan if they understood these costs and benefits. Plaintiffs claim that they were prevented from obtaining a complete understanding of the product because of the complexity of the annuity, which was exacerbated by the failure to disclose the redundancy of the tax shelter in the prospectus.

Cooper, Ferguson, and Miller maintain that the annuity's other distinguishing features (lower fund management fees and annuitization) do not change the analysis. As for the lower fund management fees, Plaintiffs do not contest that Pacific Life's fund management fees, when compared to mutual funds, are marginally lower than the industry norm.[14] However, they state that Merrill's supposition that qualified plan investors would be attracted to the annuity for this reason is misleading because he ignores the mortality and expense fees that variable annuity customers must pay, but mutual fund investors avoid. Bakos Decl. ¶ 13. Plaintiffs also emphasize that Pacific Life does not assign any economic value to the annuitization feature of the variable annuity.

Moreover, Cooper, Ferguson, and Miller assert that Merrill's study shows only that because the people who buy and sell the annuities (individual customers and registered representatives) cannot afford to commission an actuarial study to determine the value of the death benefit, Pacific Life has superior knowledge.[15] Plaintiffs maintain that despite the issuer's unique understanding of the relatively scant value of the death benefit feature, it knowingly chose to target IRA rollover investors.

Plaintiffs assert that financial experts will testify on their behalf at trial that variable annuities exist in the marketplace because of the annuities' tax shelter status, and that, in general, it injures investors to use these investment products in conjunction with qualified plans. *See* Moshe Milevesky & Steven E. Posner, *The Titanic Option; Valuation of the Guaranteed Minimum Death Benefit in Variable Annuities and Mutual Funds*, 68 J. Risk & Ins. 91–126 (2001), Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 13

Cooper, Ferguson, and Miller have produced evidence that could establish that Pacific Life made no efforts to ensure that suitability determinations were made, but instead attempted to cast off all responsibility onto its agents, the broker-dealers and the registered representatives.

In the Court's judgment, a variable annuity issuer's failure to undertake suitability reviews, or engage in suitability oversight, could constitute securities fraud. Whether liability should be imposed on Pacific Life under the facts of the instant case is a matter for the jury to determine. While perhaps not going directly to the value of the security itself, the insurer's failure to ensure suitability determinations could constitute a fraudu-

---

14. The fee is .79% at Pacific Life, compared to a mutual fund industry average at 1.37%, for actively managed funds. Merrill Report 5, Pacific Life's Aff. & Dep App., Tab 1.

15. Hanlon's deposition testimony provides some support for Plaintiffs' argument. Hanlon stated that she believed that the death benefit was worth 140 basis points annually, consistent with the mortality and expense fee, and administrative

fee, line item charges. Hanlon Dep. 124, Pacific Life's Aff. & Dep.App., Tab 9. Further, Hanlon opined that if the mortality and expense fees were imposed for the tax advantages associated with the product; then that information might be relevant to determining whether the contract was appropriate for placement within tax-deferred retirement plans. Hanlon Dep. 33.

lent omission "in connection with" the sale of a security, within the meaning of the securities law. *Zandford,* 535 U.S. at 820, 122 S.Ct. 1899.

The Court recognizes that the responsibility for determining suitability at the point of sale is typically the domain of the broker-dealer. However, the variable annuity is a complex financial product, much different than a typical stock or bond. Plaintiffs have presented evidence that the issuer has superior knowledge regarding the economic value of the death benefit, placing the issuer in a better position to determine suitability on a customer-by-customer basis, *when* the investment is to take place inside a qualified plan.

Moreover, Plaintiffs have presented some evidence that Defendants actually increased the difficulty of the suitability determination by issuing a misleading prospectus. Plaintiffs aver, with some evidentiary support, that registered representatives rely on Pacific Life to explain the appropriateness of this product within qualified plans. The Court cannot say the issuer has no responsibility for the suitability determinations as a matter of law.

In sum, Defendants may be liable under Rule 10b–5 for suitability omissions. The Court emphasizes that this holding is a narrow one, confined to the unique facts presented here. *See* NASD Notice to Members 04–45 & Insurance Marketplace Standards Association, Comment Letter on NASD Notice to Members 04–45, Micciche Decl., Exs. F & H, respectively; Jeffery S. Puretz, *Insurance Products as Securities,* 858 PLI/

Comm 45, 108–116 (2004); Peter J. Anderson, *The SEC and NASD Have Sent a Wake Up Call to Insurance Companies Issuing Variable Products: The Question is "How is the Industry Responding?",* SF36 ALI–ABA 191, 197–201, 213–14 (2000); Paul J. Mason, *Suitability: An Analysis and SEC and NASD Involvement,* SG092 ALI–ABA 167, 194–200 (2002)(discussing suitability responsibilities of insurers).[16]

## II. *Class Certification under Rule 23*

■ A class may not be certified unless it meets all the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure, and the party moving for class certification bears the burden of establishing these requirements. *Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir.1997). Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. "These are necessary but not sufficient conditions for a class action." Fed.R.Civ.P. 23 advisory committee's note (1966).

In addition, one of the requirements set forth in Rule 23(b) must be satisfied to maintain a class action. In a class action suit for money damages, common questions of law or fact must predominate over individual issues, and the class action device must be the superior method of adjudication. Fed.R.Civ.P. 23(b)(3).[17]

■ The Court must conduct a "rigorous analysis" of the claims and evidence presented to determine whether class certification is appropriate. *Gen. Tel. Co. of the*

---

16. The Court has previously recognized that the registered representative could have a duty to determine suitability. *See, e.g., United States v. Szur,* 289 F.3d 200, 208 (2d Cir.2002) (a general fiduciary duty arises if a broker has discretion over its customers' accounts). In the Order denying the motion to dismiss, the Court imputed the registered representative's possible duty to the issuer, reasoning that the principal could be liable for the agent's breach. Whether a class is maintainable under Rule 23(b)(3) on this basis is another matter, which the Court will consider below.

17. Rule 23 provides, in part:
 (a) Prerequisites to a Class Action.
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 (b) Class Actions Maintainable.
 An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition . . .
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

*Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Court neither accepts the plaintiffs' allegations as true, nor requires the plaintiffs to show that they are likely to prevail on the merits. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984).

■ "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *General Telephone,* 457 U.S. at 155, 102 S.Ct. 2364 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)).

"[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Id.* at 160, 102 S.Ct. 2364 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)).

"[A]chiev[ing] the economies of time, effort, and expense, and promot[ing] uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results" are critical considerations that guide the Court's determination. *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 315–16 (5th Cir.1978) (quoting Fed.R.Civ.P. 23 advisory committee's note (1966)).[18]

[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action.... On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there were material variations in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed.R.Civ.P. 23 advisory committee's note (1966).

## A. Requirements of Rule 23(a)

### 1. Numerosity

■ Defendants have represented that the proposed class contains 96,234 people.[19] Jolley Aff. ¶ 3, Pacific Life's Aff. & Dep.App., Tab 2. The putative class is so numerous that joinder is impracticable, and the numerosity requirement is satisfied. *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986).

### 2. Commonality

There must be at least one issue of law or fact that affects the entire class for the commonality requirement to be satisfied. The threshold for establishing commonality under Rule 23(a)(2) is not onerous—where a common scheme of deception is credibly alleged, Rule 23(a)(2) is met. *E.g., Powers v. Stuart–James Co.,* 707 F.Supp. 499, 502 (M.D.Fla. 1989).

■ The Court concludes that common issues exist. All members of the proposed class purchased a variable annuity within a qualified plan. They purchased annuities from Pacific Life at a time when the company was using a prospectus containing what could be materially misleading statements regarding the tax consequences of such an investment. July 12, 2004 Order 11–13, Doc. No. 31. This shared experience satisfies Rule 23(a)(2). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).[20] Likewise,

---

**18.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

**19.** 111,373 variable annuity contracts were sold during the class period through 14,843 different selling agents, in every state and the District of Columbia, except New York.

**20.** The commonality requirement of Rule 23(a)(2) overlaps significantly with the predominance requirement of Rule 23(b)(3), but the latter is much more exacting. The Court will consider whether common issues of law or fact *predomi-*

whether Pacific Life is liable for the suitability violations will be a common issue.

### 3. Typicality

Rule 23(a)(3) is satisfied if the class representatives' claims are like the claims of the absent class members. "A sufficient nexus is established if the claims or defenses arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Where the defendant's actions impact the named representatives in substantially the same way as other class members, typicality is satisfied. *Collins v. Int'l Dairy Queen, Inc.*, 168 F.R.D. 668, 674 (M.D.Ga. 1996).

Pacific Life maintains that Ferguson's claim is not typical of the claims of the class as a whole.[21] Pacific Life asserts that Ferguson did not know even the most basic information about the nature of the financial product that he was buying. As a result, Pacific Life states that any failure to disclose the redundancy of the tax-deferral aspect of the product, or failure to make a suitability determination, is not central to his claim.

Accepting, for the sake of argument, Defendants' characterization of Ferguson's understanding of the annuity, the Court finds that the Ferguson's claim is typical of the claims of absent class members. A general misunderstanding or ignorance regarding the variable annuity is not inconsistent with Plaintiffs' complaint, but rather encompasses the more specific allegation that the tax redundancy disclosure and suitability determination was omitted. Ferguson's claim need not be found atypical because he knew comparatively less about the product than other buyers.

This is reinforced by the fact that Ferguson testified that he was never told that the tax advantages of the annuity were unnecessary for him. Ferguson Dep. 10, Pacific Life's Aff. & Dep.App., Tab 10. While Defendants may be able to undermine Ferguson's right to recover at trial by arguing that he did not rely on the alleged omissions, this does not render his claim atypical. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir.1983). The asserted omissions are uniform, and reliance is not an issue unique to Ferguson.

The named Plaintiffs' claims are like those of absent class members, and typicality is satisfied.

### 4. Adequate Representation

Under Rule 23(a)(4), class representatives must "fairly and adequately protect the interests of the class." The class representatives' interests cannot be antagonistic to the interests of the other class members, and the class representatives' attorneys must be well-qualified. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987). Rule 23(a)(4) embodies the values of due process of law. If absent class members are to be bound by an adjudication of their rights and interests, fundamental notions of fair play and justice require that they be represented adequately. *Hansberry v. Lee*, 311 U.S. 32, 41–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

Class representatives "should have a working knowledge of the case." *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 353 (S.D.Ga. 1996). However, requiring too much of class representatives "could well prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights." *Kirkpatrick*, 827 F.2d at 728. The "basic issue of adequate representation [is] whether there are significant antagonistic interests between the representatives and the class." *Schnorbach v. Fuqua*, 70 F.R.D. 424, 428 (S.D.Ga.1975).

A lack of detailed factual knowledge about the case or a lack of understanding regarding the legal theories by the named plaintiffs does not preclude class certification in a complex case. *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 327–28 (S.D.Fla.1996); *Kirkpatrick*, 827 F.2d at 727–28.

---

nate below. For now, the Court finds only that common issues exist.

**21.** Pacific Life makes similar arguments regarding Nelson's claim, and the following discussion would apply equally to him.

Pacific Life maintains that the named Plaintiffs are not adequate representatives because Cooper, Ferguson, and Miller have given their attorneys unfettered discretion over the case, and because Plaintiffs have not shown they may be entrusted with the fiduciary responsibility of class representation.

■ While Plaintiffs' attorneys are experienced and able advocates, the Court rejects Defendants' assertion that Cooper, Ferguson, and Miller have abdicated responsibility over the case to their lawyers. Plaintiffs' depositions demonstrate that they have the ability to serve as fiduciaries in prosecuting the claims presented.

The named Plaintiffs have reviewed important documents, including multiple drafts of the complaint; they have responded to Defendants' interrogatories; they have discussed the details of the case with their lawyers; they know that they must continue to supervise their attorneys; they understand the fundamental nature of the claims presented; and they comprehend the damage that the alleged fraud has caused them to suffer. Cooper Dep. 5, 21–23, 88, 90–91; [22] Ferguson Dep. 6, 12–15, 17–18, 22–29, 96–99; Miller Dep. 6, 50–55, 63–64, Pacific Life's Aff. & Dep.App., Tabs 8, 10, & 11, respectively.

Also, it demonstrates sound judgment "to appreciate the limits of [one's] knowledge and rely on those with the relevant expertise." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61–62 (2d Cir. 2000). That is particularly true in a case such as this one, which is a relatively complex securities fraud matter. Cooper, Ferguson, and Miller are adequate class representatives.

## B. Requirements of Rule 23(b)(3)

### 1. Common Issues of Law and Fact Predominate

#### a. Applicable Considerations

■ To prevail under Rule 10b–5, Plaintiffs must show: (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) that proximately caused plaintiff's injury. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999). Whether any individual class member relied on the omission may be presumed, based upon proof that the omission would have been material to an objectively reasonable investor. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

In *Amchem Products, Inc. v. Windsor*, a lawsuit was filed with no intent that it be litigated. 521 U.S. 591, 600–02, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Rather, after negotiations between the lawyers for asbestos claimants and the lawyers for a group of former asbestos product manufacturers, the parties agreed on a plan to settle present and future injury claims. *Id.* The settlement dispute at issue in the subsequent litigation involved the future claimants. Although these individuals had not yet filed claims, plaintiffs' attorneys attempted to represent these absent claimants in negotiating with the asbestos manufacturers in reaching a compromise of their claims, because the companies were reluctant to settle pending claims without also resolving their liability against future claimants. *Id.*

Certain "future" claimants then filed suit, and the parties filed a proposed settlement agreement, and jointly moved for conditional class certification. *Id.* The complaint identified nine lead plaintiffs who either had been exposed to asbestos by a defendant, or had a family member who had been exposed. Some of the named plaintiffs claimed physical manifestations from the exposure, and some did not. The proposed settlement agreement set forth a comprehensive administrative scheme for future claimants to use in obtaining compensation. The district court certified the class, but the court of appeals reversed, and held that the require-

---

**22.** While it is true that during Cooper's deposition, Pacific Life's attorney was able to get Cooper to agree that he gave "unfettered" discretion to his attorneys, it is clear from the context of that admission that Cooper did not understand what the word meant ("What that word mean, unsatisfied or something?" Cooper Dep. 23, Pacific Life's Aff. & Dep.App., Tab 8). The Court is satisfied, in light of the context of the statement, and the statements made by Cooper in the other portions of the deposition, that he will serve as an adequate representative of the class.

ments of Rule 23 had not been met. *Id.* at 602, 117 S.Ct. 2231.

The Supreme Court affirmed the appellate decision, finding that, while the settlement was relevant to the propriety of class certification, the Rule 23 requirements must still be satisfied, to the extent applicable. *Id.* at 618–20, 117 S.Ct. 2231. The Court reasoned that, when confronted with a certification request for settlement purposes only, the district court need not concern itself with whether the case would be impossible to manage, if it proceeded to trial. *Id.* at 620, 117 S.Ct. 2231. However, the other Rule 23 requirements deserve "undiluted" or "heightened" treatment "in the settlement context." *Id.* These rules ensure that it is fair to bind absent class members because they ensure unity of interest. *Id.* at 621, 117 S.Ct. 2231.

The *Amchem* Court found that individual issues of law or fact predominated, as "[c]lass members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer[ed] no physical injury[,]" while others suffered from debilitating asbestos-related diseases. *Id.* at 624, 117 S.Ct. 2231 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626–27 (3d Cir.1996)).

Moreover, some class members smoked cigarettes, creating a difficulty in proving causation for those claimants, but not others. *Id.* The "sprawling" class was further complicated by differences in the tort law of the several states, which in some states, provided causes of action for some "exposure only" claims, like medical monitoring, which were non-compensable under the terms of the settlement agreement. *Id.* at 604, 624, 117 S.Ct. 2231.

The Court went on to remark that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud...". *Id.* at 625. However, where disparities among class members are significant, caution must be exercised by the district court in determining whether to certify the class. *Id.; see also Kirkpatrick*, 827 F.2d at 724–25; *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir.2003); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254–1268 (11th Cir.2004) (analyzing predominance requirement of Rule 23(b)(3)).

### b. Analysis

#### i. The Class May Not Be Certified Based on an Agency Theory

To determine whether the tax disclosures and suitability determinations were made by particular agents to specific class members would necessitate individual "mini-trials" concerning what some 96,000 claimants were told by nearly 15,000 registered representatives. Liability would exist, or not, depending on what each agent said in individual sales meetings. *E.g., Simon v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 883 (5th Cir.1973); *Clark v. Watchie*, 513 F.2d 994 (9th Cir.1975). Individual issues would overwhelm the case, making it too unwieldy to be managed in one action.

However, because liability may be premised on Pacific Life's own actions and omissions, the insurer's arguments regarding agency are largely beside the point. The first point Pacific Life makes concerns whether the individual agents made the tax disclosures and suitability determinations at issue. As discussed below, this does not defeat the predominance of common issues.

Second, Pacific Life maintains that it is a question of fact whether the registered representatives were acting on behalf of Pacific Life, or the class members. Pacific Life posits that this determination is influenced by each state's master-servant law, and that variations in legal standards from state to state make the class unmanageable. Because the case will not be certified based on Pacific Life's relationship with its selling agents, the Court need not consider this argument.

#### ii. Certification is Appropriate Based on Pacific Life's Common Course of Conduct

In the instant case, proof will be common throughout the class. Looking to the elements of the securities fraud claims

presented, Plaintiffs will have to establish an omission, of a material fact, made with scienter, which proximately caused their injuries. With respect to the alleged failure to make the tax shelter redundancy disclosure, the prospectuses used during the class period were, in all material respects, uniform.[23] Whether the disclosures were made adequately is a common issue.

Pacific Life's responsibility for the suitability determinations can also be resolved on a classwide basis. The insurer's duty to monitor the sales practices of its agents would not vary depending on particular class members, and Plaintiffs have presented some evidence to support their contention that Pacific Life made no effort to conduct suitability reviews at the time it received customers' applications. Griggs Dep. 14–16, 22, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 7.

Proof of materiality will be common as well, with the test for determining this element being particularly well-suited to classwide disposition: each class member must show that the asserted omissions were material to an objectively reasonable investor. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The anti-fraud provisions of the federal securities law also require Plaintiffs to prove that Defendants acted with the required state of mind. Whether Defendants acted with scienter will be a common issue. Defendants did not omit the tax disclosure negligently in the prospectus in some instances, yet intentionally fail to make this disclosure

with respect to other customers. Similarly, Plaintiffs' proof of Pacific Life's abdication of responsibility for determining suitability suggests uniform intent.

Plaintiffs have produced some evidence that Pacific Life targeted customers who were rolling over their retirement funds into an IRA to invest in a variable annuity, without disclosing that the tax-deferral feature of the product was superfluous. Sealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 1; Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 2.

Plaintiffs have also presented evidence that Pacific Life responded to customer complaints about the suitability of variable annuities in a routine manner. The insurer's letters in reply to such complaints stated:

> It is Pacific Life's position that our variable annuity products are appropriate investment vehicles for tax qualified retirement plans, such as individual retirement accounts. The charges associated with the variable annuity do not pay for the tax deferral provided by a variable annuity, but rather for the insurance benefits and guarantees that the variable annuity provides.

Sealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 5 at 2; Tab 6 at 2; *see also* Tab 7 at 1–2.

This common response bears upon Defendants' state of mind, allowing a fact-finder to infer that Pacific Life acted with severe recklessness on a classwide basis, in failing to undertake suitability oversight and reviews.[24]

---

**23.** In the amended complaint, Cooper, Ferguson, and Miller also aver that training by, and materials from, Pacific Life to sales agents omitted the tax shelter redundancy disclosure. Am Compl. ¶¶ 37, 45–47. On the other hand, a Pacific Life Sales Guide issued to registered representatives, beginning in January 2001, explained that it was important for registered representatives to "disclose to the customer that tax-deferral is already provided by the tax-qualified retirement plan." Sales Guide 19, Pacific Life's Sales Literature App., Tab 1. *See also* Retirement Plan Comparison of January 2001, Pacific Life's Sales Literature App., Tab 9. Thus, after this date, Plaintiffs' averments regarding this point may have little merit. Consistent with the governing standards on a motion to certify a class, the Court could

consider the allegations made in the complaint to determine the propriety of class treatment. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722–23 (11th Cir.1987) (considering allegations of complaint, admonishing the district court for rejecting an allegation because the lower court had found evidentiary support to be wanting). Yet, the Court need not rely on Plaintiffs' unsupported allegations to find that certification is proper in the case *sub judice*.

**24.** *See also* the "Overcoming Objections" Power-Point presentation attached to the affidavit of Gregor Darm, located in Pacific Life's Aff. and Dep App., Tab 3A (slide entitled "VA in a Qualified Plan," followed by a bullet point, accompa-

Causation will also be amenable to common proof. Without evidence to the contrary from Defendants, it may be presumed that the transactions would not have occurred but for the omissions at issue ("transaction causation"). *Affiliated Ute,* 406 U.S. at 153–54, 92 S.Ct. 1456. Moreover, it will not be difficult to attribute the loss to the alleged wrongdoing, as is true in other securities fraud cases where a particular stock or bond is asserted to have garnered an inflated price due to fraud ("loss causation"). *E.g., Dura Pharm., Inc. v. Broudo,* —— U.S. ——, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Each class member will use the same actuarial evidence to demonstrate that each was damaged to the same degree, by a standard annual fee of 1.4%.[25]

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue might profitably be tried in one suit.

*Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975).

Pacific Life argues that the instant case is overwhelmed by individual issues, because it involves tens of thousands of point-of-sale interactions. In support of this argument, the insurer cites to affidavits by NASD-registered principals Joseph Jacques and Robert Szuch. Jacques and Szuch have placed Pacific Life variable annuities in customers' qualified plans, and each financial advisor maintains that he made the proper disclosures to his clients. Affs. of Jacques & Szuch, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tabs 5 & 6; *see also* Jacques Financial, LLC, Variable Annuity Checklist, Pacific Life's Add'l Docs. App., Tab 14.

Similarly, Pacific Life submitted a disclosure form used by one of its selling agents, CUE, a broker-dealer in Phoenix, Arizona. CUE Variable Annuity Disclosure Form, Pacific Life's Add'l Docs.App., Tab 13. This form sets out the redundancy of the tax shelter within a qualified plan in some detail. Pacific Life argues that purchasers who were Jacques' and Szuch's clients, and those who signed the CUE form, have a different case than Hanlon's clients, who signed no such form.

Pacific Life states that the case law supports its argument, citing to a series of "vanishing premium" cases.[26] In one such case, *Keyes v. Guardian Life Insurance Company of America,* the court refused to certify a class action, finding that individual issues predominated. 194 F.R.D. 253 (S.D.Miss. 2000). The plaintiffs asserted that the defendant insurer created the uniform policy illustration software, allegedly based on faulty actuarial assumptions. The plaintiffs perceived this to be a common issue that predominated over any individual issues in the case. *Id.* at 254.

However, the court found that the specific sales practices by the individual sales agents created too many unique questions of fact to allow Rule 23(b)(3) to be satisfied. Because *Keyes* involved allegations of oral misrepresentations by individual agents, the court decided that the case was different than other cases based on misrepresentations found "in the policy itself." *Id.* at 256 (citing *Cope v. Metro. Life Ins. Co.,* 82 Ohio St.3d 426, 696 N.E.2d 1001 (1998)). In addition, whether the plaintiffs relied on the alleged misrepresentations was a barrier to certification, as it could not be presumed under most states'

---

nied by the statement: "Double Tax-deferral...So what?").

**25.** Jolley Aff. ¶ 4, Pacific Life's Aff. & Dep.App., Tab 2 (cataloging contract amounts, which varied widely).

**26.** "Vanishing premium" policies are life insurance policies that allow dividends and interest from previous premium payments, if sufficient, to pay annual premiums in later years. In this way, the recurring premium is no longer owed by the insured, who retains continued insurance coverage

common law or consumer fraud statutes. *Id.* at 257 n. 5.[27]

Defendants cite other cases to the same effect. However, the Court finds these decisions inept, as it rejects Pacific Life's characterization of the instant case as one primarily involving point-of-sale disclosures. Rather, classwide liability exists, if at all, because of the insurer's common course of conduct, through misleading omissions in the prospectus, and otherwise, not because of what Defendants' agents said or did in individual sales meetings.

In *Cope v. Metro. Life Ins. Co.*, insurance policyholders brought suit against the insurer, MetLife, alleging that the insurer sold replacement insurance as new insurance to class members, without making mandatory disclosures. 696 N.E.2d at 1001–02. The trial court declined to certify the class, concerned that liability would depend on what policyholders were told by their individual sales agents. *Id.* at 1003. The state supreme court reversed, explaining: "Courts generally find that the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of fraud or misrepresentation claim, especially where written misrepresentations are involved." *Id.* at 1004.

Defendants argue that *Cope* is distinguishable because the insurer was required by a particular Ohio law to provide certain disclosures in writing. This argument is unpersuasive because a specific federal regulation, Rule 10b–5, requires Pacific Life to disclose all material facts in connection with the sale of a security.

The disclosure forms and affidavits from Jacques and Szuch do not alter the analysis. *Affiliated Ute,* 406 U.S. at 153–54, 92 S.Ct. 1456. While such documents and witnesses may overcome the presumption of reliance at trial as to any particular class member, they

do not defeat the predominance of common issues. *Kennedy v. Tallant,* 710 F.2d 711, 717–18 (11th Cir.1983).

> Assuming *arguendo* that some of the plaintiffs are subject to a defense based on the reliance issue, class certification is still proper.... '[P]roof of reliance has usually been considered an individual question' proved separately after the determination of common questions.

*Schnorbach v. Fuqua,* 70 F.R.D. 424, 437 (S.D.Ga.1975) (quoting *Mersay v. First Republic Corp.,* 43 F.R.D. 465, 471 (S.D.N.Y. 1968)).

As one court has noted,

> Any securities fraud class action runs the risk of including individual investors who may be ineligible for recovery for any number of reasons, including actual knowledge of the alleged fraud. If the possibility that certain class members might eventually be excluded were sufficient to preclude class certification, there could *never* be a securities fraud class action. At trial, defendants may choose to bear the burden and cost of proving that any particular investor had access to ... information that gave that investor actual knowledge of the alleged scheme.

*In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 102–103 (S.D.N.Y.2004).

In his report, Merrill also describes why he believes that suitability cannot be determined "on a global basis." Merrill opined that a number of factors could be relevant to determining whether a variable annuity was a suitable investment inside a qualified plan for any particular investor, including the customer's investment horizon, age, interest in leaving a bequest, risk tolerance, other investments and savings, financial sophistication, and possible need to access the contract money before the surrender period ends.

---

**27.** This latter point, that reliance could not be presumed, stands in stark contrast to the instant case. For this reason, *Buford v. H & R Block, Inc.,* is also unpersuasive. 168 F.R.D. 340 (S.D.Ga.1996). In *Buford,* the thrust of the complaint was that the defendants had fraudulently misrepresented its Refund Anticipation Loan ("RAL") program "by referring to it as a Rapid Refund and blurring the lines of the RAL's status

as a loan rather than an actual tax refund." *Id.* at 345. The court could not presume that each member of the proposed class believed that she received a direct refund rather than a high interest loan. *Id.* at 360 Thus, *Buford* involved affirmative misrepresentations, in a non-securities fraud context, and *Affiliated Ute*'s presumption of reliance did not apply. *Id.* at 359 n. 8.

Yet, granting that these factors must be considered as to each customer, Pacific Life may be liable on a classwide basis for the uniform disclaiming of responsibility for suitability reviews of customers' purchases. The fact that some individual consideration of customers' unique circumstances would have been necessary to determine suitability does not mean that Defendants are not amenable to common proof that the reviews did not occur at all.

Pacific Life further contends that its sales literature shows that there was no uniform method of deception. In May 2000, Pacific Life began publishing a Client Guide, which the insurer gave to its sales agents to distribute to customers if the registered representatives desired to do so. This document contained a disclosure of the redundancy of tax-deferral when placing a variable annuity inside a qualified plan.

The Guide states:

> You can use pre-tax dollars to purchase an annuity within an individual retirement account (IRA) or for a 'qualified plan.' ... It's important to know that these plans, as well as IRAs, are also tax-deferred. Therefore an annuity contract should be used to fund an IRA or qualified plan to benefit from the annuity's features other than tax deferral.

Client Guide 8, Sales Literature App., Tab 4.

Pacific Life posits that an individual inquiry would be required to ascertain whether each class member received a Client Guide. Cooper, Ferguson, and Miller assert that this is another reliance issue, and note that the Guide was not distributed to any customer before May 2000, halfway through the class period. Moreover, Plaintiffs argue that even if a class member did receive the Client Guide, the disclosure therein was inadequate.

Plaintiffs are free to argue to the jury that this statement was inadequate to put Client Guide recipients on notice. If the fact-finder accepts that argument, then the Client Guide is of little import. On the other hand, if the fact-finder determines that this disclosure was adequate, and that particular class members received the Client Guide, then those class members may be excluded from recovery.

Pacific Life also maintains that the class members were put on notice of their claims by disclosures appearing in national media coverage, regulatory actions, and in litigation. *E.g., Lander v. Hartford Life & Annuity Co.*, 251 F.3d 101 (2d Cir.2001). Pacific Life states that this is true as to the entire class, and urges the Court to dismiss the claims against it. *Shah v. Morgan Stanley*, No. 03 Civ. 8761(RJH), 2004 WL 2346716, at *10 (S.D.N.Y. Oct. 19, 2004).[28]

"A reasonable investor is deemed to have knowledge of well publicized and widely available information in the public domain." *Meadows v. Pac. Inland Sec. Corp.*, 36 F.Supp.2d 1240, 1246 (S.D.Cal.1999) (citation omitted). In *In re Monumental Life Ins. Co.*, the court explained that "whether the media reports were sufficiently publicized so as to provide constructive notice is an issue reserved for the merits. Our analysis is limited to whether this issue is determinable on a classwide basis." 365 F.3d at 421.

The *Monumental Life* court found that the issue was common, because defendants did not allege that media coverage was more prevalent in some areas of the country than in others. *Id.* The same is true in the case *sub judice*. Pacific Life has not alleged that media coverage was particularly pronounced in any specific state or region. Defendants have cited numerous news articles, in several publications, that take a dim view of the sales practices at issue in the instant case. *See* Pacific Life's Statute of Limitations Appendices. Many of these publications are distributed nationwide, including *The New York*

---

**28.** In arguing, in the alternative, that varying coverage in local media outlets makes classwide determination impossible, Defendants rely on a strained reading of the Court's discussion of *United Klans of Am. v. McGovern*, 621 F.2d 152 (5th Cir.1980), in the Order on the motion to dismiss *See* July 12, 2004 Order 22–24, Doc No 31 The Court clarifies that it does not read *Mc-*

*Govern* as inconsistent with the standards, and permissible methods of proof, discussed herein. "The requirement of 'widespread publicity,' *McGovern*, 621 F.2d at 154, suggests, however, that the appropriate frame of reference is the national media market, at least for issues of national importance." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 421 (5th Cir.2004).

*Times, The Wall Street Journal, The Washington Post, Fortune, Money,* and *Business Week.* "[A]nd although many other publications are local newspapers, that fact is entirely consistent with national treatment of the issue." *In re Monumental Life Ins. Co.,* 365 F.3d at 421.

■ Notwithstanding the foregoing, Pacific Life states that it may argue at trial that the unique mix of facts available to any one class member put him or her on notice regarding the alleged fraud. However, "even if some of the class members were threatened with a potential statute of limitations defense, that problem would not necessarily defeat the availability of a class action suit." *Kennedy,* 710 F.2d at 718. "[Q]uestions of notice and due diligence are particularly suited for a jury's consideration." *Id.* at 716.

The Court concludes that whether class members were on constructive notice by the media coverage, regulatory actions, and litigation, is a common issue, properly reserved for the merits. While it is permissible for Defendants to rebut a claim of reliance, or assert a statute of limitations defense, by showing that a particular purchaser was aware of the fraudulent omissions based on a news article that he read, that does not defeat the predominance of common issues. Pacific Life's statute of limitations defense does not preclude class certification.

In sum, common issues of law and fact predominate.

### 2. The Class Device is the Superior Method of Adjudication

Rule 23(b)(3) provides a nonexclusive list of factors for the Court to consider to determine whether the class action is the superior means of dispute resolution:

The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties

likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

■ These factors indicate that a class action is the superior method of adjudication. First, no absent class member has indicated an interest in controlling the prosecution of a separate action. Second, there is no indication that there are other, related suits pending against Pacific Life by absent class members. Third, it is preferable to concentrate the litigation of this dispute in the Southern District of Georgia, as this will promote efficiency and avoid inconsistent adjudications. Fourth, the case appears to present no unusual case management problems.

The Court rejects Pacific Life's suggestion that NASD arbitration of individual claims is a superior means of adjudication. Pacific Life Insurance Company is not a member of NASD, and is not subject to such arbitration. The Court recognizes that its subsidiary and co-Defendant, Pacific Select Distributors, Inc., is a NASD member.

However, Plaintiffs argue that Pacific Life Insurance Company is perhaps the most culpable party, and that it should not escape judicial scrutiny. Cooper, Ferguson, and Miller assert that (1) the insurance company conceived the plan of targeting qualified plan investors, (2) the insurance company designed the product, (3) it had superior knowledge of the product's economic value, (4) it was the primary financial beneficiary of the alleged wrongdoing, and (5) because the variable annuity is a contract, only the insurance company is in a position to waive the surrender penalties and provide restitution for the insurance charges collected.

The Court finds that this argument has merit, and that a class action is the best way to resolve the dispute. The class is cohesive, and the amount at stake for any one claimant is so small as to make the kind of complex, protracted litigation required in this type of case to be cost-prohibitive on an individual basis. It would be inefficient and burdensome for the courts, and Defendants, to allow the claims to be prosecuted individually.

### CONCLUSION

For the reasons explained above, Plaintiffs' motion to certify the class is **GRANTED**. *See* Doc. No. 37. Certification of this class is provisional, and the Court may create sub-classes, or decertify the class, at any time before final judgment, if subsequent developments so require. Fed.R.Civ.P. 23(c)(1)(C); *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

The class hereby certified consists of:

all persons who purchased an individual variable deferred annuity contract or who received a certificate to a group variable deferred annuity contract issued by Pacific Life Insurance Company, or who made an additional investment through such a contract, on or after August 19, 1998 through April 30, 2002 (Class Period), which was used to fund a contributory retirement plan or arrangement qualified for favorable tax treatment pursuant to sections 401, 403, 408, 408A or 457 of the Internal Revenue Code.

Excluded from the Class are defendants, any officer or director of defendants or entity in which defendants had a controlling interest at any relevant time, any member of those persons' immediate families and legal affiliates, heirs, controlling persons, agents, successors and predecessors in interest or assigns of any such excluded person or entity.

Am. Compl. ¶¶ 1, 53.

The motions to appoint the class representatives and class counsel are **GRANTED**. The Court hereby appoints Samuel Cooper, Albert Ferguson, and Herbert H. Miller, Jr., as class representatives.

In accordance with Federal Rule of Civil Procedure 23(g), the Court hereby appoints Milberg Weiss as class counsel. As demonstrated by the press coverage submitted by Pacific Life, it would be difficult to find a better qualified group of lawyers to serve as class counsel in this particular type of case. Deborah Lohse & Bridget O'Brian, *Lawyers Seek Class Action Against Insurers Over Annuities,* Wall St. J., Nov. 9, 1999, at C1 & Ron Panko, *Can Annuities Pass Muster?,* Best's Rev. 103, 108 (July 2000), Pacific Life's Statute of Limitations App. (Part 2 of 2), Tabs 67 & 94, respectively. To date, the firm has identified and investigated the claims in an able manner, as evidenced by the firm's briefs, supporting documentation, and oral argument presentations. The Court is satisfied that class counsel has an adequate understanding of the applicable law, and that they will commit their resources to prosecuting this matter with diligence.

Tucker, Everitt, Long, Brewton & Lanier, P.A., is hereby appointed as liaison counsel. This firm has significant experience in class action litigation, and the Court is confident that the firm's attorneys will represent the members of the class, and assist Milberg Weiss in litigating the dispute, in a competent fashion.

Under Rule 23(c), individual notice must be given to all members of the class that can be identified reasonably. As Defendants purport to know the exact number of claimants in the class, the Court surmises that no obstacle will be presented to Plaintiffs' sending individual notice by United States mail to all members of the class.

Defendants are **DIRECTED** to make available to Plaintiffs the names and addresses of all members of the above-defined class. Plaintiffs are hereby **DIRECTED** to submit a proposed notice to class members, in accordance with Rule 23(c)(2)(B), for the Court's consideration, within thirty days of this Order. Within ten days of Plaintiffs' submission, Defendants shall submit to the Court any objection they have to Plaintiffs' proposed notice, and may submit an alternative proposed notice.